Argued and submitted February 6, affirmed May 10, petition for review denied
September 14, 2017 (361 Or 885)

In the Matter of J. E. K.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

M. K.,
*Appellant.*

Jackson County Circuit Court
15JU04275; A163188 (Control)

In the Matter of E. E. M. K.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

M. K.,
*Appellant.*

Jackson County Circuit Court
15JU04276; A163189

396 P3d 294

Amelia Anderson, Deputy Public Defender, argued the cause for appellant. With her on the briefs was Shannon Storey, Chief Defender, Juvenile Appellate Section, Office of Public Defense Services.

Jeff J. Payne, Assistant Attorney General, argued the cause for respondent. With him on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Duncan, Presiding Judge, and DeVore, Judge, and Garrett, Judge.

## GARRETT, J.

In this consolidated juvenile dependency case,[1] mother appeals the juvenile court's permanency judgments that changed the permanency plan for her children from reunification to guardianship with the paternal grandparents. Mother argues that the juvenile court erred in concluding that, despite the Department of Human Services' (DHS) reasonable efforts to effect reunification, mother had not made sufficient progress for the children to safely return home. We conclude that the record contains sufficient evidence to support the juvenile court's conclusions and, accordingly, affirm.

The parties do not request that we engage in *de novo* review under ORS 19.415(3)(b), and this is not an exceptional case in which we exercise our discretion to do so. *See* ORAP 5.40(8)(c) ("The Court of Appeals will exercise its discretion to try the cause anew on the record or to make one or more factual findings anew on the record only in exceptional cases."). We, therefore, defer to the juvenile court's findings of historical fact and assume that the juvenile court implicitly found predicate facts necessary to support its disposition. *Dept. of Human Services v. C. L. H.*, 283 Or App 313, 315, 388 P3d 1214 (2017). Our review is limited to determining whether the evidence, as supplemented and buttressed by permissible derivative inferences and considered in the light most favorable to the juvenile court's disposition, was sufficient to support those conclusions that mother now challenges. *Dept. of Human Services v. T. M. S.*, 273 Or App 286, 288, 359 P3d 425 (2015). We state the facts consistently with our standard of review.

Mother and father are the married parents of E and J, who were 16 and 10, respectively, at the time of the permanency hearing. The parents had at least a four-year history of domestic violence; the altercations occurred almost

---

[1] The record indicates that the cases for E and J were consolidated twice—once in July 2015 in conjunction with judgments of jurisdiction for each child as to mother, and again in October 2015 in conjunction with judgments of jurisdiction for each child as to father. For purposes of this appeal, we refer to the dependency petitions and judgments of jurisdiction for each child collectively as the dependency petition and the judgment of jurisdiction.

daily, often in the children's presence, and included physical assaults and verbal fights, name calling, and profanity. Mother had filed multiple restraining orders against father over those years, reporting instances when father had put his arms around mother's neck and pinned her to the couch, had threatened to take the children, and had stabbed the bed with a pocket knife. Mother also reported that father isolated mother from family and friends, and committed other acts of emotional and verbal abuse. Nevertheless, after mother had obtained the restraining orders against father, mother invariably allowed father to return to the home.

DHS first became significantly involved with the family in 2011, when DHS received a report that the children had been present for a scene of domestic violence between father and mother, for which father eventually pleaded guilty to assault. DHS determined that the children were at risk of harm and placed the children in mother's custody. DHS dismissed its wardship of the children after mother filed a restraining order against father.

In May 2015, DHS received reports that J was being suspended from school because of behavioral problems and was out on his own all day, without any supervision or means of contact, and that father was back living in the house with mother, despite a restraining order against him. DHS was again contacted in early July 2015 regarding another incident of domestic violence, in which mother and father had gotten into a physical fight and mother had hit father with a frying pan. DHS also received a report that J was still being allowed "to roam through town" without supervision, and that mother had locked E out of the house at 10 p.m. one night, that E had called the police for help, and that although the officers and E knocked on the door, mother did not respond. The grandmother eventually drove to the house and took E to her home.

After interviewing both parents and concluding that the children should be placed with the grandparents, DHS filed a petition for dependency, alleging as bases for the juvenile court's jurisdiction: (1) "[d]omestic violence in the [mother's] home creates a harmful environment for the child"; and (2) "[d]omestic violence in the [father's] home

creates a harmful environment for the child." DHS reported at that time that the home environment was not calm "both when [father] is in the home and when the boys are not being supervised," and that "given [mother's] extensive history of continuing to allow [father] back into the home [in violation of the] restraining orders, [and of] exposing her children to violence," the children were best placed with the grandparents. The juvenile court assumed jurisdiction on July 20, 2015.

In a report filed with the juvenile court in October 2015, DHS reported that the home remained dangerous for the children because the parents continued to engage in the same dangerous behavior of domestic violence in the home. The children were fearful of returning back to the same situation they were in before, and wished to remain with their grandparents because the children felt they had a stable family life there. The caseworker further reported that DHS had provided mother with supervised visitation of the children, but the case worker had stopped the visits because the children had immense anger toward mother and refused to visit her, and because the visits "had been very unhealthy." Consequently, there had been no visits with mother since August 2015.

DHS created, and mother agreed to, an action agreement for the purpose of reuniting the family. Mother agreed to maintain regular contact with her caseworker, attend therapeutic counseling visits, complete a mental health assessment, complete a substance abuse assessment, and attend domestic violence treatment classes.[2] At the time of the permanency hearing, mother had completed the substance abuse assessment and the domestic violence classes. Additionally, she had twice attempted to file divorce papers against father, which had been dismissed because the attempted service on father failed both times. Mother was also requesting therapeutic visitation with the children, but the children still refused to see mother.

---

[2] Father had also been offered transportation services, domestic violence classes, and supervised visitation with the children. The record does not indicate that he completed the domestic violence classes, but he visited his children under the grandparents' supervision.

Both E and J testified at the permanency hearing, describing in detail their parents' behaviors and the effect that those behaviors had had on E and J. E described how mother once hit him with a belt with metal studs, as hard as she could "until I bled," and that once, in an apparent drug-induced state, mother threatened him with a butcher knife, running after him until he was able to find his own knife to defend himself. E testified that his parents' fights, most of which involved mother and father calling each other "bad names" and swearing at each other, were "kind of like an everyday basis. Like it was natural." The effect of those daily fights caused E to "stop[] caring," and J explained, "I was always at the skate park. I wasn't even near the house." Both E and J had poor attendance at their schools before their removal from their parents, and J had been suspended from school multiple times for behavioral problems that had included "throwing chairs at people." E described being homeless for four years, and staying in places where he could hear the sound of bongs being used in the next room. Mother acknowledged in her testimony that the boys' home circumstances during this time were not good, and blamed their homelessness on "another domestic violence issue that we had."

Both children reported to DHS that their grandparents' home was their only stable environment and that they felt safe, secure, loved, and nurtured there. The children's behavior, their school attendance, and their academic performance had improved in the care of their grandparents. E had started to feel motivated to learn again, had a part time job, and was playing football, and J intended to play football and baseball.

Both children testified that they were afraid to return to mother because they believed that she would do the same things that she had done before, and they would again be exposed to drugs and the parents' domestic violence. They believed that, contrary to mother's testimony, father was again living with mother and they did not believe that their mother was sincere in her progress. They also feared that, if they were to meet with mother in a therapeutic visit, mother would manipulate J, as she had done in the past, by promising J things if he would come back to her.

The record reflects that E, in particular, had expressed great anxiety about returning to mother—that he would be physically harmed, threatened, or emotionally abused. The psychologist who evaluated E and J in December 2015 concluded that,

> "should [E] return to the care of his parents, I would anticipate a change in trajectory—that is, [E] has been doing better since coming into his grandmother's home and, sadly, I would expect deterioration in his overall level of function should he return to his parents' care without very substantial changes being made in their ability to manage their roles as parents."

DHS's initial recommendation for the permanency plan was reunification. By the time of the permanency hearing on August 3, 2016, DHS had changed its recommendation to guardianship; the children's attorney, the court appointed special advocate (CASA), and father all agreed with DHS's recommendation. Mother opposed the change, arguing that she had completed the services required by DHS and had made sufficient progress. Mother also requested that the court require the children to engage in therapeutic visitation with mother. The juvenile court set a contested case hearing for September 7, 2016, to determine whether the permanency plan should be changed to guardianship.

At the September 7 hearing, DHS, rather than seeking an immediate change of the plan, requested that the juvenile court allow mother another 120 days in which to attempt therapeutic visitation with the children. The children and the CASA held to their positions and expressed their readiness to move forward with the hearing, and the juvenile court held the hearing. After reviewing the reports and hearing testimony from the DHS caseworker, the children's mental health counselor, mother, and the children, the juvenile court ordered the permanency plan changed from reunification to guardianship and entered judgment accordingly. Mother appeals that judgment.

The issue that mother raises on appeal concerns the children's desire to remain with the grandparents and their refusal to participate in therapeutic visitation. Mother argues that DHS should have done more to effect therapeutic

visitation, and that, in light of mother's completion of the required programs, the children's desire to stay with their grandparents and their refusal to participate in therapeutic visitation were not adequate grounds for concluding that mother's progress was insufficient for the children to return home.

ORS 419B.476(2)(a) directs our analysis. It provides:

> "If the case plan at the time of the hearing is to reunify the family, [the juvenile court shall] determine whether [DHS] has made reasonable efforts * * * to make it possible for the ward to safely return home and whether the parent has made sufficient progress to make it possible for the ward to safely return home. In making its determination, the court shall consider the ward's health and safety the paramount concerns."

As presented here, those provisions pose two concerns. The proponent of the change in the permanency plan must prove by a preponderance of the evidence "that (1) [DHS] made reasonable efforts to make it possible for the child to be reunified with his or her parent and (2) notwithstanding those efforts, the parent's progress was insufficient to make reunification possible." *Dept. of Human Services v. S. M. H.*, 283 Or App 295, 305, 388 P3d 1204 (2017). According to mother, the preponderance of the evidence does not support either the juvenile court's conclusion that DHS made reasonable efforts or its conclusion that mother's progress was insufficient. We address each of those arguments separately.

As to reasonable efforts, although mother acknowledges that DHS provided her with some services to effect reunification, she argues that, because DHS "identified therapeutic visitation as the key service necessary for reunification," and then failed to provide that service, DHS necessarily did not make reasonable efforts. DHS responds that its efforts to effect therapeutic visitation were reasonable, and failed for the legitimate reason that the children adamantly refused to participate and would have been harmed if forced to engage in the visits against their will.

The reasonableness of DHS's efforts "depends on the particular circumstances of each case and [is] assessed in the totality of the circumstances with reference to the facts

that formed the adjudicated bases for jurisdiction." *Dept. of Human Services v. M. A. H.*, 284 Or App 215, 223, 391 P3d 985 (2017) (citation omitted; internal quotation marks omitted). The uncontroverted evidence shows that DHS provided, and mother completed, domestic violence classes and substance abuse assessments; that DHS provided mother with transportation services; that the children received mental health counseling; and that, on 13 occasions, DHS provided visitation for mother with the children, until the children refused further visits beginning in August 2015. It is also uncontroverted that DHS recommended therapeutic counseling, that the DHS caseworker asked the children on multiple occasions about visiting mother, and that the children's mental health counselor asked E and J in their separate counseling sessions with him if they wanted to return to mother. The record indicates that the children's answers never varied; they adamantly refused to meet with mother.

Mother argued at the permanency hearing that she had asked DHS for therapeutic visitation and that the permanency plan should not be changed until DHS had tried to effect therapeutic visitation one more time. The parties presented two possible options in that regard—either forcing the children to participate or giving mother the opportunity to engage in a letter-writing process that, according to the children's mental health counselor, could eventually lead the children to agree to therapeutic visitation. Consequently, mother's argument appears to be that DHS failed to make reasonable efforts to effect reunification because DHS did not pursue either of those options.

Mother is correct that our focus in the "reasonable efforts" analysis is on whether DHS's efforts gave mother "a reasonable opportunity to demonstrate [her] ability to adjust [her] behavior and become a 'minimally adequate' parent." *Dept. of Human Services v. M. K.*, 257 Or App 409, 417, 306 P3d 763 (2013) (internal quotation marks omitted). Nevertheless, DHS's efforts to assist mother are considered under the totality of the particular circumstances in this case, in light of the paramount concern for the children's health and safety. *Id.* at 416. Thus, as mother concedes, the juvenile court could properly consider evidence of any harm

that the children would suffer from forcing them into therapeutic visitation with mother.

Mother argues, however, that the record does not contain sufficient evidence of harm—just evidence that the children refused visits. We disagree. This is not a case where the children merely expressed a preference to remain with their grandparents. At the time that they first refused further visits with mother, they expressed to the DHS caseworker their fear and anger that they would be returned to the same situation with mother and father that they had experienced before. In their testimony at the permanency hearing, the children said that they believed a return to mother would expose them again to their parents' domestic violence and that they would cease doing well in school under those circumstances. They were also concerned that mother would use a visit to manipulate J. The record also reflects the caseworker's determination that visits should be ceased not only because of the children's refusal to participate, but because the visits were "unhealthy." Finally, both the caseworker and the children's mental health counselor opined that forcing the children to meet with mother would be detrimental to them. Mother offered no evidence countering the children's expressed fears or the caseworker's and the counselor's belief that forced visits would be harmful. Thus, there is sufficient evidence in the record to permit a finding that the children would suffer harm if they were forced into therapeutic visitation with mother, and the juvenile court did not err in considering such harm.

In addition to the possible harm from forced visitation, the juvenile court was also entitled to consider DHS's efforts in the context of the children's adamant refusal to cooperate with visits.

The record indicates that, despite the children's fears and their refusals to see mother, DHS did not cease attempting to provide therapeutic services. Instead, the caseworker and the mental health counselor, on multiple occasions, suggested to the children visitation with mother. The caseworker testified:

"At every visit I ask them how they're feeling about visiting with Mom, how they're feeling about—honestly, quite

frankly, having some contact with Mom. They have numerous times * * * indicated that they did not want to have any contact. I've offered to be there myself to be present at visits and they said 'No.' [E] quickly says—objects to that. [J] also does. And I've had private conversations with them away from each other as well."

The caseworker further testified, "I go over special stuff mom's been doing well, trying to get something set up whether it's visits where they even go to the counseling sessions with her and they've refused to do that."

Mother contends that DHS's efforts were not reasonable, because DHS did not also pursue the letter-writing process that the children's mental health counselor testified he had used successfully with other families. That process, the counselor explained, involved helping mother to write a letter to the children that demonstrated her understanding of how her behavior had adversely affected them. The counselor testified:

"And then once the letter was really strong enough, and that would take some work, then at that point—again, if I [am] working with the kids, then I would introduce the letter to the [children] and see if they were—would be willing to hear Mom read the letter to them. The way that meeting would be structured is Mom doesn't get to do anything except read the letter and the kids get to ask any questions that they want to ask. And the therapist's job is to make sure that the kids don't end up feeling guilty or trying to take care of Mom. And that's a possible way to begin the healing process."

Implicit in the juvenile court's determination that DHS made reasonable efforts is its finding that it was not unreasonable for DHS to decline to pursue the letter-writing option. The evidence supports that finding in several ways. The mental health counselor testified that, although he had had some success with the letter-writing process in other cases, those cases involved children who were eager to reunite with their parents; he could not recall success in any case "where the kids were absolutely so rigidly adamantly 'No way.'" The counselor also acknowledged that, even if the process were successful in leading to therapeutic visitation, the letter-writing process could take as long as two months

before visits would become viable. Furthermore, the juvenile court specifically found that mother continued to minimize the effects of the domestic violence on the children. Given that the main purpose of the letter-writing process would be for mother to show that she fully understood the impact of her conduct, it is reasonable to infer that mother's minimization of that conduct would further extend the time needed for the letter-writing process to be effective. In short, both in light of the extensive efforts that DHS made and in light of the evidence that further efforts to pursue therapeutic visitation would have been unproductive or even harmful, we conclude that the juvenile court did not err in concluding that DHS made reasonable efforts to achieve reunification.

We now turn to the "sufficient progress" issue. Mother argues that the juvenile court erred in concluding that mother had "not made sufficient progress toward meeting the expectations set forth in the service agreement, letter of expectation and/or case plan, and the child[ren] * * * cannot be safely returned to mother's care." According to mother, the juvenile court erred for two reasons: (1) the court, by considering evidence of the children's alienation from mother as one of the grounds for changing the permanency plan, made its conclusion on a basis extrinsic to the juvenile court's original jurisdiction, *see Dept. of Human Services v. D. W. C.*, 258 Or App 163, 171, 308 P3d 316, *rev den*, 354 Or 490 (2013) (court must find that "the parent has not made sufficient progress in ameliorating the barrier to reunification that is identified in the jurisdictional judgment"); and (2) mother's completion of all of the required programs and her progress resulting from those programs conclusively established that mother had made sufficient progress.

Mother's first argument was not raised before the juvenile court. A claimed error is not reviewable "unless the error was preserved in the lower court." ORAP 5.45(1). We may consider "an error of law apparent on the record," *id.*, but mother has not argued, nor would we conclude from our review of the record, that the juvenile court's consideration of the children's alienation from mother constituted error apparent on the record. The record indicates, rather, that the children wanted the permanency plan changed because

they believed that they would be harmed if returned to mother. Mother acknowledged the children's continuing alienation from her, but argued that the court should address the alienation by ordering therapeutic visitation.[3] Mother did not object to the evidence pertaining to the children's alienation from her, nor did she argue that the jurisdictional petition operated as any constraint precluding the juvenile court's consideration of that evidence. We, therefore, decline to address mother's first argument.

Mother's second argument is that the uncontroverted evidence that she had completed all of the required programs and had shown progress as a result of those programs "precluded" the juvenile court from concluding that she had not made sufficient progress. DHS responds that ORS 419B.476(2)(a) requires not just that a parent make progress, but that the parent has made sufficient progress so that the children can *safely* return home. We agree with DHS. In determining whether the parent has made sufficient progress, the juvenile court gives the highest priority to a child's health and welfare. *Dept. of Human Services v. S. J. M.*, 283 Or App 592, 598, 388 P3d 1199 (2017). "Even if a parent has completed all services that have been required, evidence that a parent continues to engage in behavior that is harmful to a child supports a determination that the parent has not made sufficient progress to make it possible for the child to return home." *Dept. of Human Services v. G. N.*, 263 Or App 287, 297, 328 P3d 728, *rev den*, 356 Or 638 (2014). Consequently, regardless of mother's completion of and progress in the required programs, if mother was still engaging in behaviors that would be harmful to her children, the court could conclude that mother's progress was not sufficient for them to safely return home. Such evidence exists here.

---

[3] Mother's counsel argued to the juvenile court:

"Here, we have a parent who has done her progress. She's made amazing progress and here we are at a standstill because the children apparently don't want to see her, which appears to be really unnatural to me. We have pushed for counseling to try and bridge that gap, and the response is they're not interested, which I'm puzzled by. I understand that the children may be angry, but that is really the whole purpose of counseling. These are her children. They should be with a parent. If the parent is safe and this mother is safe[.]"

It is clear from the record that the children suffered harm as a result of the domestic violence in their home. One can reasonably infer from this record that, because of the fights and domestic violence, the children's lives were in constant upheaval. DHS was called multiple times about domestic violence in the home, father was in and out of jail for violating restraining orders, and the parents' fights and violent behavior led E to "stop[] caring," and caused J to stay away from the home until late at night, sometimes in the company of older children who "smok[ed] pot." As we have already noted, as a result of the domestic violence, mother and the children were homeless for four years, and stayed at residences where the children were exposed to drug use. Both children had poor attendance at their schools and J had been suspended multiple times for behavioral problems in class that included J throwing chairs at people. There was evidence in the record that J's violent behavior at school was directly linked to the domestic violence at home. As a result of the parents' domestic violence at home, E had been physically and emotionally harmed—as well as threatened with both—and as a result of the domestic violence and its accompanying consequences, E sometimes suffered panic attacks just at the thought of being returned to his mother.

The record also permits a conclusion that mother continued to engage in behavior that would create a risk of the same types of harm if the children were returned. The record reflects that mother repeatedly allowed father back into the home even after obtaining restraining orders against him; there was some evidence that father was again living with mother at the time of the permanency hearing. In addition, as discussed above, there was evidence that mother continued to minimize the impact of the domestic violence on the children. Thus, the juvenile court could reasonably conclude that the children could not safely be returned home, regardless of mother's completion of other services directed by DHS.

Affirmed.