Argued and submitted March 16, affirmed July 12, 2023

In the Matter of A. H.,
a Child.
DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*
*and*
A. H.,
*Respondent,*
*v.*
C. H.,
aka C. P., and C. J.,
*Appellants.*

Multnomah County Circuit Court
20JU00301;
Petition number 113945;
A179463

533 P3d 1112

Mother and father appeal from a judgment changing the permanency plan for their child, A, from reunification to adoption. The juvenile court concluded that the Department of Human Services (DHS) had made reasonable efforts to reunify parents and A, that parents had made insufficient progress to allow that to happen, and that no compelling reason existed to forgo changing the plan to adoption. Mother and father challenge each of those findings on appeal. *Held*: The Court of Appeals held that the juvenile court did not err in concluding that DHS had made reasonable efforts to reunify A with her parents over the course of two and one-half years, but that A could not be safely returned to parents' care due to their insufficient progress. In addition, the court concluded that parents failed to carry their burden of showing that a compelling reason existed to not change the permanency plan to adoption under ORS 419B.498(2)(b).

Affirmed.

Kathryn L. Villa-Smith, Judge.

Sean K. Connor, Deputy Public Defender, argued the cause for appellant C. H. Also on the briefs was Shannon Storey, Chief Defender, Juvenile Appellate Section, Office of Public Defense Services.

Kristen G. Williams argued the cause and filed the brief for appellant C. J.

Stacy M. Chaffin, Assistant Attorney General, argued the cause for respondent Department of Human Services. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Christa Obold Eshleman waived appearance for respondent A. H.

Before Aoyagi, Presiding Judge, and Joyce, Judge, and Jacquot, Judge.

JOYCE, J.

Affirmed.

Jacquot, J., dissenting.

**JOYCE, J.**

Mother and father appeal from a judgment changing the permanency plan for their child, A, from reunification to adoption. By the time of the permanency hearing, A had been in the care of Department of Human Services (DHS) for two and one-half years. The juvenile court concluded that DHS had made reasonable efforts to reunify parents and A, that parents had made insufficient progress to allow that to happen, and that no compelling reason existed to forgo changing the plan to adoption. Mother and father challenge each of those findings. We are "bound by the juvenile court's factual findings as to what efforts DHS has made, so long as there is any evidence in the record to support them," and whether DHS made "reasonable efforts" and whether parents made sufficient progress are legal conclusions that we review for errors of law. *Dept. of Human Services v. K. G. T.*, 306 Or App 368, 370, 473 P3d 131 (2020) (findings); *Dept. of Human Services v. V. A. R.*, 301 Or App 565, 567, 456 P3d 681 (2019) (reasonable-efforts determination); *Dept. of Human Services v. G. N.*, 263 Or App 287, 294, 328 P3d 728, *rev den*, 356 Or 638 (2014) (sufficient progress). Applying those standards, we affirm.

## I.  FACTUAL BACKGROUND

Because this appeal involves a challenge to the reasonableness of DHS's efforts, and because parents and DHS had worked together for two and one-half years by the time of the permanency hearing, a somewhat lengthy recitation of the relevant facts is necessary.

Mother gave birth to A in December 2019. A was born prematurely and spent time in the Neonatal Intensive Care Unit (NICU) due to her small size. Hospital staff became concerned about parents' ability to care for A—parents did not regularly visit A in the NICU, did not provide care for her when they did visit, did not have clothing or supplies for A, and intended to cosleep on a mattress, which can be dangerous for an infant. At some point shortly after A's birth, DHS became involved due to those concerns about A's care. DHS also learned that approximately four months prior to A's birth, parents' rights to two older children had been terminated in California after parents failed to make

progress in services and were unable to meet those children's specialized medical needs. About two weeks after her birth, DHS placed A in nonrelative foster care.

A.   *Jurisdictional Adjudication and Psychological Evaluations*

DHS filed a petition to bring A within the jurisdiction of the juvenile court. In February 2020, father admitted to an allegation that A has specialized medical needs that father is unable to meet and that place A at risk of harm and that father needs the court's and DHS's assistance to provide supports and services to safely care for A. The juvenile court ordered father to participate in parenting classes, obtain housing, visit with A, maintain contact with DHS, and participate in services and A's medical appointments.

The case was held in abeyance as DHS moved for appointment of a guardian *ad litem*. Mother has significant cognitive limitations, which we detail below, and the court ultimately granted the petition to appoint a guardian *ad litem* in September 2020.

Shortly thereafter, DHS referred mother for a neuropsychological evaluation with Dr. Guastadisegni. At the time of the evaluation, mother and father had been living in a shelter for several months after having moved from the home of father's mother. Mother reported that they were looking for low-income housing. Mother told Guastadisegni that they had been homeless in California for several years and had difficulty finding employment. Mother was unable to describe to Guastadisegni why she did not have custody of her older children or why A was in care. She also could not provide detailed information about father.

Mother's IQ scores fell within the "extremely low range," and Guastadisegni diagnosed mother with an intellectual disability, mild to moderate; neurodevelopmental disorder due to low IQ; executive function deficits; and a neurocognitive disorder, "major, unspecified." He provided recommendations for services for mother, which included:

- Social service assistance and case management;
- Individual counseling to address her history of life instability, to provide "psycho-education" about

her disabilities, and to assist her in developing life skills;

- Hands-on parent training and a parent mentor;

- Presenting information to mother in a graduated manner and with written summaries of information; and

- Provide mother with a skill set to maximize her ability to function at a higher level, including setting up regular schedules.

Guastadisegni did not believe that mother, as of the time of the evaluation, could independently parent A. In his view, mother did not have the "insight and understanding about what it takes to parent a child[,]" in part due to her cognitive limitations. He made clear, however, that he was not concluding that mother could not parent because of her cognitive limitations. Rather, given her intellectual disability, "she is always going to have limitations." It would be more realistic, rather than mother parenting independently, that she could be a "non-primary co-parent in the home with her child" with another caregiver who is identified as the responsible parent. Mother would need "substantial supports in place to function."

Guastadisegni identified several objective measurements that could be used to assess mother's progress, including (1) attend her appointments and follow through with the expectations laid out for her; (2) maintain a clean home and take care of daily tasks like grocery shopping; (3) attend visits; (4) demonstrate independent parenting skills, without prompting and guidance and oversight; and (5) communicate with A's providers.

Mother had a feedback session scheduled, which father was to attend with her. Although parents were reminded of the session and released early from another service to participate, they cancelled the appointment.

In February 2021, mother admitted to a jurisdictional allegation that her cognitive disability interferes with her ability to care for A and provide her with stable housing and that she needs the court's and DHS's assistance to

provide supports and services to safely care for A. The juvenile court ordered mother to enroll in hands-on parenting classes, obtain stable housing, engage in individual counseling or mental health treatment, visit with A, maintain contact with DHS, work with a parent mentor, and participate in services and A's medical appointments. The court ordered DHS to provide information to service providers about "best communication style for working with the mother, and her learning style."

The court also adjudicated two amended allegations as to father, including that father's residential instability interferes with his ability to safely parent A and that he does not understand how mother's cognitive limitations affect her ability to independently and safely parent A. The court ordered father to participate in a psychological examination, which—after missing his first two assessment dates—he did in September 2021 with Dr. Duncan. During the evaluation, father admitted that they had been "kicked out" of the shelter and had resumed living with his mother. Father said that they were continuing to search for a two-bedroom apartment.

Father's IQ fell into the extremely low range. Duncan diagnosed father with a mild intellectual disability and an unspecified depressive disorder. In Duncan's view, the intellectual disability significantly interfered with father's daily functioning and parenting capacities. Duncan believed that father had little insight into his need for parenting services and his engagement to date had been "poor." Duncan noted that father will need a lot of assistance and support to optimize his ability to parent. He recommended that father receive a referral to Developmental Disability Services, that he participate in individual therapy, and that he receive additional education to help him understand A's needs and mother's limitations.

B.   *Services*

DHS offered parents services consistent with the recommendations from the evaluations. As described below, parents engaged in some services and declined to participate in others.

### 1.  *Developmental Disability Services*

Based on the recommendations from the psychological evaluations, DHS referred parents to Multnomah County Intellectual and Developmental Disability Services. Although the record is somewhat sparse on exactly what Developmental Disability Services would do for parents, there was evidence that the agency provides case planning and services management for those with developmental disabilities, including assistance with obtaining housing. Mother had a case manager, who explained that "to develop a support plan and to refer [mother] to paid providers who can assist her directly[,]" an assessment would need to be completed. Mother's case manager then reported that mother was not interested in services. Father missed several scheduled evaluations and ultimately did not participate in any services.

### 2.  *Visitation and parenting training*

DHS referred parents to a parenting program, Family United, which provided hands-on parenting coaching and parenting education. DHS notified the hands-on parenting coach that mother had an intellectual disability. The coach explained that Family United had "much experience working with parents and children with an array of learning barriers," and they would work with mother to "present information in a way" that she could understand.

Parents completed hands-on training twice, first in May 2021 and again in September 2021. Family United encountered some "challenges with [father] around his own ability to understand, remember information and problem solve that we would like to work with him on." Although the facilitator noted that Family United would not be the "best fit" for teaching father about mother's needs, Family United was "totally open to having a [developmental disability] worker come to our facility to work with the family." However, because parents never utilized Developmental Disability Services, that never occurred. That said, those visits generally went well, and parents earned high marks for their consistency, engagement, and care for A.

Outside of working with parents during their visits with A, Family United also provided parents with parenting education, some of which focused on parents who have intellectual or mental health barriers. Family United routinely texted parents reminders about visitation and education sessions and reiterated the importance to parents of completing all of the conditions for A's return. It also encouraged father to "consider [mother's] limitations when being asked by Service Providers so that the proper assistance can be provided to the family."

DHS also referred parents to The Family Room, which would provide additional visitation with hands-on support from the staff. Parents did not follow up on the first referral, so DHS made a second referral. However, by that point in time, the parents had been asked to leave the shelter in which they had been living because father physically assaulted mother. The Family Room was not able to have both parents together at the same time due to the history of domestic violence and offered separate visitation, which parents declined.[1]

Parents then engaged in visits with the Center for Family Success, although at the time of the permanency hearing those visits were on pause because the supervisor had been out on family leave. Parents have been consistent in attending those visits and by all accounts, those visits are positive. Father supported mother in her parenting, A was engaged with parents, and parents gave positive support and attention to A. A generally seemed excited to see her parents.

DHS also made two separate referrals for parents to visit A with a Social Service Assistant (SSA) in early 2022. That referral was closed due to missed visits. DHS then made two separate referrals in late March or early April of 2022. The SSA arranged for visits on one or two occasions and brought A to the office, but parents did not attend the

---

[1] Mother relied on father for transportation, and the parents and their attorneys asked that services be provided jointly, which sometimes limited the services in which they could participate.

visit. DHS then closed both referrals because the SSA never heard back from the parents.

### 3.  *Parent mentoring*

DHS referred parents to the Morrison Child and Family Services for a parent mentor. For mother, DHS made the referral twice. Mother worked with a parent mentor for several months in 2021, and her mentor assisted her with housing needs (including helping with applications), visitation, support with applying for social security, helping mother understand A's needs, and other services. DHS referred mother again in January 2022, but that referral was closed because mother failed to make contact. DHS referred father once, and father did not make contact.

### 4.  *Housing*

DHS engaged in a number of efforts designed to help parents find stable housing. As just described, a parent mentor could help parents with housing, but mother stopped working with her mentor, and father never engaged with his. DHS also worked with the shelter that parents were living in at one point to help parents obtain permanent housing. DHS then referred parents to the Family Unification Project and My Father's House, both of which could help with housing. The Family Unification Project is a culturally specific program that supports families to secure safe and stable housing. It focuses on reducing disproportional representation in communities who are over-represented in the child welfare system. Neither referral resulted in housing for parents because they were not selected for the programs or the programs had long waitlists, *i.e.*, through no fault of parents. DHS also provided mother with help applying for a housing voucher for New Columbia Apartments, and Family United paid for mother's housing application.

In July 2022, the same month as the permanency hearing, mother spoke with a service coordinator at Developmental Disability Services and indicated that she wanted to access the short-term rental assistance program. DHS also learned that additional openings for Family Unification Project housing became available, and DHS was working on an updated application for mother and father.

5. *Counseling*

DHS also referred mother to counseling services through Wolfpack Family Therapy Services, which provides "all kinds of support, whether it's domestic violence intervention, or just a parent support worker, or regular mental health individual counseling." That referral was closed after mother stopped having contact. Father is not enrolled in the Oregon Health Plan, which would have paid for the counseling recommended for father. DHS referred father to an agency that could help him enroll in the Oregon Health Plan and also referred father to a parent mentor for that same purpose, but father declined to do so.

6. *Communication and relationship with DHS and resource parents*

DHS and parents had a somewhat difficult relationship throughout the case, and communication between them was inconsistent. Parents' first permanency worker was David Udlock. In September 2021, father's counsel asked that DHS assign a new "culturally specific caseworker" because, in father's view, the relationship had broken down between father and Udlock, undermining the goal of reunification. Mother and father are Black, and the first resource parent was white. Father's attorney observed that father felt disrespected as a Black parent, by both DHS and the resource parent. DHS ultimately declined the request but identified ways in which Udlock could be more effective in his relationship with father.

One of the sources of father's frustration with DHS and the resource parent was related to caring for A's hair. A's hair was dry and rough, so during visits, mother brought hair products and tools and spent time each visit moisturizing it and putting it in braids. Over time, the quality of her hair improved, and the hair care routine provided important bonding between mother and A.

The resource parent, however, asked that mother not put A's hair in braids because it takes her a long time to take the braids out and she believed that A did not like them. A family reunification specialist at Family United

reached out to DHS about the issue. She recognized that the conflict over A's hair can be "a sensitive subject for folks as it concerns ethnicity and cultural differences." Father told DHS that he did not "want or need anyone else to style [A's] hair." DHS referred A's resource parent to a program where "they can meet with an African American hair stylist with the child to learn about how to do her hair," but there was no availability in the program.

After several months, during which time the resource parent continued to take out A's braids after visits, DHS provided the resource parent with a hair consultation from someone who specializes in "maintaining and styling textured ethnic hair." The consultant assessed the resource parent's hair care products and accessories and provided her with some additional items to style A's hair. The consultant noted that the resource parent had taken other hair care classes to learn about A's hair type and texture. She showed the resource parent how to shampoo, condition, and moisturize A's hair. The resource parent agreed to leave A's hair in braids between visits.

DHS assigned Jamie Ruiz to the case in March 2022, about four months before the permanency hearing.[2] Ruiz spoke with mother "once or twice," and mother indicated that she was still interested in visits, and they talked about dates and times. Her subsequent attempts to contact parents were "unsuccessful"—no one would answer mother's phone, and then Ruiz got a message that the "subscriber is not accepting phone calls." She left father several voicemails and did not get a return call. Although Ruiz had the address where parents were staying (with father's mother), she did not travel to the home to make contact, send a letter to that address, ask either parents' attorney or mother's guardian *ad litem* for help contacting him, or call father's mother.

C.  *Child's Needs*

At the time of the hearing, DHS had moved A to a new resource family, the same family who had adopted A's

---

[2] It is unclear whether the change in caseworkers was the result of father's request.

two older siblings after parents' rights had been terminated.[3] The resource parents wanted to adopt A. A was engaged in physical and occupational therapy. She was small for her size and needed assistance reaching some early growth milestones, including motor skills. Because of her premature birth, she will require close attention to her physical health and development.

D.   *Permanency Hearing*

At the time of the hearing in July 2022, A had been in foster care for two and one-half years. Ruiz, who was the only witness at the hearing, was concerned about parents' lack of contact and lack of participation in services. She explained that the referrals that DHS made for mentors, therapists, and developmental disability services were intended to build a community around mother to address the jurisdictional basis that mother needs a support system that allows her to safely care for the child. She explained that mother has not been able to regularly attend scheduled appointments, maintain a home, or demonstrate that in conjunction with father's assistance, they can safely and independently parent. Ruiz testified that father has not demonstrated that he understands mother's limitations.

At the conclusion of the permanency hearing, the juvenile court concluded that DHS had made reasonable efforts to reunify A with her parents, but that A could not be safely returned to their care. The court therefore changed the plan from reunification to adoption. In doing so, the court observed that visits had gone well but that parents had not been able to advance to unsupervised visits or demonstrate that they can care for A independently. In the court's view, the "most significant barrier has been parents['] lack of follow through and unwillingness to attend services." The court concluded that "[v]ery little progress has been made" despite the services offered and "parents still have no understanding of how their intellectual disability interferes with daily functioning and parenting capacity." The court concluded that no compelling reasons existed to forgo a plan of adoption because, in part, parents were not participating

---

[3] This resource family is different from the one who had a conflict with parents over A's hair.

in services that will make it possible for A to safely return home within a reasonable time.

Both parents appeal. In mirror image assignments of error, mother and father assert that the juvenile court erred in concluding that DHS had made reasonable efforts towards reunification, that parents' progress was insufficient, that there was no compelling reason to forgo a plan of adoption, and that A's permanency plan should be changed from reunification to adoption.

## II.  DISCUSSION

We begin with parents' challenge to the juvenile court's conclusion that DHS failed to make reasonable efforts towards reunifying parents with A. Without question, DHS offered parents a wide variety of services over two and a half years. Having just described in detail those efforts above (and again below in addressing parents' specific arguments), we will not repeat them here.

Given the extensive services that DHS offered, it would normally be a fairly straightforward matter to conclude that DHS's efforts were reasonable. But two issues of concern prevent us from so readily reaching that conclusion. The first is with respect to DHS's handling of the conflict between parents and the first resource parent over A's hair care. Parents point to that conflict as evidence of DHS's failure to provide culturally competent services. As counsel for DHS candidly acknowledged at oral argument, DHS's response to the conflict between parents and the resource parent over A's hair contributed to the degradation of the relationship between parents and DHS. Although the issue was resolved, it took nearly five months and even then it is not clear that DHS did so in a way that addressed the disrespect and harm that parents experienced as a result of the resource parent's resistance to their efforts on A's behalf. Unquestionably, the importance of mother and A spending that time together cannot be overstated.[4] Concomitantly, the

---

[4] Parents submitted an exhibit at the permanency hearing that highlighted the cultural importance of that time together. The exhibit explained that hair has "played a major role in [B]lack American history," bringing "families together, *** helping children establish a sense of self," and that "[l]ittle is more precious and intimate than a [B]lack little girl getting her hair done by her mother."

impact that the conflict had on parents' engagement with DHS cannot be measured. At a point in time where DHS's primary purpose was to provide services to reunify parents with their child, it is troubling that DHS had not prepared the resource parent better and did not move more quickly to resolve the conflict in a manner that communicated respect for the family's culture.

It is also troubling that DHS did little beyond leaving messages on parents' phones to contact them in the four months before the permanency hearing, a timeframe that is particularly important for assessing reasonable efforts purposes. *See Dept. of Human Services v. S. S.*, 278 Or App 725, 735, 375 P3d 556 (2016) (DHS's efforts are evaluated over the entire duration of the case, "with an emphasis on a period before the hearing"). This is especially concerning given what the record indicates about the parents' disabilities, which interfere with their ability to recognize the need for services and to follow through with the steps needed for access. The record does not strongly establish that DHS did enough to facilitate the support that parents needed to access the services offered, particularly in those last four months.

Although it is a close question, we ultimately conclude that the juvenile court did not err in concluding that DHS made reasonable efforts. The issue with the first resource parent was ultimately resolved in a way that adjusted the response to parents' efforts to provide hair care and that did not result in a disruption in other services. And while we retain some concern about the level of support given to parents to access services given their disabilities, the record also contains many examples in which parents apparently refused services, even while they did engage some services. It is difficult to make the case on this record that parents would have accessed additional services given the many instances when they did not appear for appointments or directly rejected services offered.

---

Parents also submitted DHS's Vision for Transformation, which itself recognizes the importance of culturally appropriate services to children, young adults, and families.

Given that we evaluate the reasonableness of DHS's efforts in their totality and over time and given the breadth and length of services that DHS *did* offer to parents, DHS's failure to address the conflict more effectively over A's hair and DHS's failure to take additional steps to contact parents or pursue resources that would help them access services does not amount to a failure of reasonable efforts on this record.[5]

We disagree with parents' remaining arguments about DHS's efforts. They assert that DHS's efforts were not "developmentally and culturally appropriate[.]" Father, for instance, argues that DHS simply "mechanically referred parents to services and expected them to access and execute services on their own," something that was unrealistic in light of parents' cognitive limitations.[6] Yet the record shows that DHS referred parents to resources that were specifically designed to build a support network for parents and that were tailored to their cognitive limitations. A parent mentor or developmental disability services caseworker could have helped develop support plans and provide referrals to other providers, yet beyond mother doing some initial work, parents did not avail themselves of those services. DHS worked to ensure that Family United, which engaged in hands-on parenting coaching with parents, knew that mother had intellectual limitations so that they could provide information to mother in a way that she could understand. Family United was also willing to have an additional developmental disability support worker come to visits to help parents, but parents did not engage in that service. Those services, along with the many others described above, in tandem, were designed to remedy the barriers that parents had to parenting A by providing parents with a support system

---

[5] In a thoughtful dissent, Judge Jacquot reaches a different conclusion. Although we disagree over the ultimate outcome, we do not disagree over an important point, which is that Black parents are disproportionately represented in the child welfare system and that DHS must work to ensure that parents of color are respected and supported in culturally appropriate ways.

[6] In cases where the parents have disabilities, ORS 419B.090(5) requires DHS to provide parents with "opportunities to benefit from or participate in reunification services that are equal to those extended to individuals without disabilities." When necessary, DHS must provide "aids, benefits and services different from those provided to parents *** without disabilities." *Id.*

that was tailored to the way in which parents needed to receive information and assistance.

Parents also argue that DHS failed to make reasonable efforts specific to the bases over which the juvenile court took jurisdiction. *Dept. of Human Services v. N. T.*, 247 Or App 706, 715, 271 P3d 143 (2012) (the juvenile court must evaluate reasonable efforts through the lens of the adjudicated bases for jurisdiction). For example, they argue that DHS failed to make reasonable efforts in helping them find housing. They point to the fact that they were living with father's mother and to the extent that that was not stable housing, DHS did not assist them in finding another place to live.

There are two flaws with that argument. The first is that neither parent suggested that father's mother's residence was where they intended to establish stable housing.[7] To be sure, father's mother offered to be a resource parent for A, but throughout the life of the case, parents lived in different locations, including a shelter, and engaged in intermittent services to obtain other housing. Father's own attorney, in September 2021, described to DHS that parents have been "homeless for the duration of this case," and mother's advocate observed in January 2022 that parents needed permanent housing. That was still true, as discussed above, at the time of the permanency hearing, when mother had recently reached out to disability services to access short-term rental assistance program. Second, DHS provided referrals to three specific housing agencies, as well as referrals to developmental disabilities and parenting mentors, each of which could have helped parents with housing. DHS's efforts in that regard were therefore reasonable.

For his part, father acknowledges that he did not "proactively engage in all department-referred services throughout the life of the case." He nonetheless suggests that his resistance does not excuse the department from making reunification efforts. That much is true, as far as it goes. "[I]n determining whether DHS made reasonable

---

[7] We appreciate that in some respects, this point overlaps with the question whether parents made sufficient progress to enable A to return home.

efforts, we consider a parent's lack of cooperation, but we evaluate such lack of cooperation within the context of DHS's conduct and the case circumstances." *Dept. of Human Services v. R. W.*, 277 Or App 37, 44, 370 P3d 543 (2016); *cf. Dept. of Human Services v. N. S.*, 246 Or App 341, 350, 265 P3d 792 (2011), *rev den*, 351 Or 586 (2012) (although "[s]ome of DHS's efforts were hampered by mother's conduct," DHS's efforts in response to that conduct were reasonable). Although a parent's resistance to services does not legally excuse DHS from making reasonable efforts, at no point did DHS stop providing efforts in light of father's resistance to them. In fact, as recently as the week leading up to the permanency hearing, the caseworker was still working with a housing agency to help the family in obtaining stable housing. Framed slightly differently, DHS did not use father's resistance as an "excuse" to stop providing services.

In sum, as the juvenile court found, DHS engaged with parents over the course of two and one-half years with an array of services that were designed to ameliorate the jurisdictional bases and that were tailored to parents' developmental limitations.

We turn to the question of whether the juvenile court correctly ruled that parents had not made sufficient progress so as to allow A to safely return to their care. "In determining whether the parent has made sufficient progress, the juvenile court gives the highest priority to a child's health and welfare." *Dept. of Human Services v. M. K.*, 285 Or App 448, 460, 396 P3d 294, *rev den*, 361 Or 885 (2017). Under our standard of review, we view the evidence "in the light most favorable to the trial court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome." *Dept. of Human Services v. N. P.*, 257 Or App 633, 639, 307 P3d 444 (2013). We agree with the juvenile court's conclusion that "very little progress has been made" by parents.

Although parents engaged and did well with the hands-on parenting services, they did not engage with all the visiting services available to them and, as the juvenile court noted, they had not been able to move to unsupervised visits or demonstrate that they could parent independently.

And while it may be true, as parents argue, that parenting independently is not a necessary precursor to having a child returned to their care, the record does not contain evidence showing that parents had a plan other than to parent independently. They did not, for instance, suggest that they intended to parent in conjunction with another person or with services that could help in areas where parents otherwise struggled. And although the visits between parents and A went well, one-hour visits once or twice a week are, without more, insufficient to demonstrate that parents had made the progress needed to allow A to return home safely. That holds particularly true given that parents generally otherwise did not engage in the services that would have enabled them to make the progress required to safely parent A. Parents' lack of follow through and engagement with services presents a particular concern given that A has regular occupational and physical therapy appointments and needs close attention to her physical development.

Finally, we conclude that the juvenile court correctly concluded that no compelling reason exists to forgo a permanency plan of adoption for A and in changing the plan from reunification to adoption. *See* ORS 419B.498(2)(b) (DHS must file a petition to terminate parental rights in a certain timeframe unless "[t]here is a compelling reason, which is documented in the case plan, for determining that filing such a petition would not be in the best interests of the child or ward"). A "compelling reason" exists if parents demonstrate that "[a]nother permanent plan is better suited to meet the health and safety needs of the child or ward, including the need to preserve the child's *** sibling attachments and relationships." ORS 419B.498(2)(b)(B); *Dept. of Human Services v. S. J. M.*, 364 Or 37, 55, 430 P3d 1021 (2018) (parents carry the burden of showing a compelling reason).

Parents contend that they met that burden because they showed that they have a bond with A and that preserving her "positive relationship with her biological family" was a compelling reason not to change the plan to adoption. We have previously assumed, without deciding, that a bond could be found by the juvenile court to be a compelling reason not to change the permanency plan to adoption. *Dept. of*

*Human Services v. M. T. P.*, 294 Or App 208, 218, 430 P3d 585 (2018), *rev den*, 364 Or 407 (2019).

To be sure, no party disputes that parents love A and that she enjoys seeing them during visits. If the agency pursues a termination of parents' rights, it will need to establish that severing A's legal relationship with them is in her best interests. As we have explained, "significant weight" must be accorded "to the importance of preserving a child's relationship with [her] biological parent where that is possible to do consistent with [her] best interests." *Dept. of Human Services v. D. F. R. M.*, 313 Or App 740, 746, 497 P3d 802, *rev den*, 368 Or 702 (2021) (reversing the juvenile court's judgment terminating the mother's parental rights because the department did not prove that the child's need for permanency could only be achieved through adoption).

Nevertheless, parents did not carry the burden of demonstrating that "[a]nother permanent plan is better suited to meet [A's] health and safety needs" so that a compelling reason exists not to file a termination petition. ORS 419B.498(2)(b)(B). Although parents suggested below that a permanent guardianship should be pursued, they did not address that proposal in any detail. On appeal, it is not entirely clear what permanent plan they are urging should be pursued, only that the plan should not be adoption.[8] Accordingly, the juvenile court did not err.

Affirmed.

**JACQUOT, J.,** dissenting.

I am not persuaded that the Department of Human Services (DHS) made reasonable efforts under the circumstances to reunify parents and A. The reasonableness of DHS's efforts depends on the particular circumstances of the case. *Dept. of Human Services v. S. M. H.*, 283 Or App 295, 305, 388 P3d 1204 (2017). We cannot look at these cases

---

[8] We note that DHS likewise has not established that a permanent guardianship could not be pursued, and also acknowledge the dissent's concern about whether DHS has adequately explored how and whether father's mother might be a resource for the family. Nevertheless, at this stage of the proceedings, parents bear the burden of establishing that termination should not be pursued because another permanent plan is better suited to meet the child's needs. *See S. J. M.*, 364 Or at 55.

in a vacuum and minimize the full context giving rise to parents' struggles with DHS and DHS's responsibility to repair the relationship. My primary concern lies with DHS's response to parents' requests for culturally specific services.

Mother and father are Black individuals with disabilities. Black parents are disproportionately represented in the child welfare system, and that disparity often creates a tension between the parents and state entities.[1] During this case, father felt disrespected as a Black parent by both DHS and the resource parent, and his attorney requested that a new culturally sensitive caseworker be assigned. However, despite father's view that the relationship had irreparably broken down for reasons related to his race, DHS initially denied the request.

DHS's attempts to deal with the disabilities of the parents primarily consisted of referring the parents to other brokerage services. DHS did not attempt to reduce the resistance to using those services or assist parents with understanding the need to develop a family system from the resources available to them that could support child safety without agency involvement in the future. Finally, the practice of prohibiting relatives from serving as foster placements for children if the relative is also providing housing support for parents deprived the family of the opportunity to parent their child with the help of father's mother, an arrangement that may have been a workable solution for this family.

When DHS did replace the caseworker in March 2022, it did not assign someone who could provide culturally specific services. Instead, DHS assigned a new caseworker who failed to do more than attempt to call parents monthly. DHS was aware of the mounting tension in its relationship with parents, but in the months leading up to the hearing, it did no more than leave a few voicemails despite having multiple other ways to contact parents.

---

[1] The 2021 Child Welfare Data Book indicates that 3.8 percent of Oregon's children are Black but 7.1 percent of Oregon's foster care population come from that demographic. That data trend has persisted despite efforts to develop criteria equitably at the central office level and provide training to field offices to reduce disparity. Oregon Dep't of Human Services, *2021 Child Welfare Data Book* 16 (Sept 2022), https://www.oregon.gov/dhs/CHILDREN/CHILD-ABUSE/documents/2021-cw-data-book.pdf (accessed May 31, 2023).

When the conflict arose between parents and the resource parent regarding A's hair, DHS took five months to resolve the issue. Engaging in this culturally relevant activity strengthened the relationship between parents and A and connected her to her culture in a way the resource parent and caseworker did not appreciate. By failing to resolve parents' concerns in a timely manner, DHS further degraded its relationship with parents.

These parents needed more. They deserved more. They needed to believe that DHS's goal was reunification and that DHS would both respect them and also support them. The distrust between a marginalized community and the institution that has repeatedly taken its children only grows when that community's culture and practices are impeded and their importance disregarded. Black parents are disproportionately represented in the child welfare system, and we will never make progress towards changing that disparity unless we actively work against it one family at a time. Because DHS failed to make reasonable efforts to reunify parents and A under the circumstances of this particular case, I would reverse. Therefore, I respectfully dissent.