26                                             No. 39

IN THE SUPREME COURT OF THE
STATE OF OREGON

In the Matter of A. H.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Respondent on Review,*
*and*

A. H.,
*Respondent on Review,*

*v.*

C. H.,
aka C. P.,
*Appellant,*
*and*

C. J.,
*Petitioner on Review.*

In the Matter of A. H.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Respondent on Review,*
*and*

H.,
*Respondent on Review,*

*v.*

C. H.,
aka C. P.,
*Petitioner on Review,*
*and*

C. J.,
*Appellant.*

(CC 20JU00301) (CA A179463)
(SC S070430 (Control); S070454)

En Banc

On review from the Court of Appeals.*

Argued and submitted March 14, 2024.

Kristen G. Williams, Williams Weyand Law, LLC, McMinnville, argued the cause and filed the briefs for petitioner on review C. J.

Sean K. Conner, Deputy Public Defender, Office of Public Defense Services, Salem, argued the cause and filed the briefs for petitioner on review C. H. Also on the briefs was Shannon Storey, Chief Defender, Juvenile Appellate Section.

Stacy M. Chaffin, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review Department of Human Services. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Christa Obold Eshleman, Youth, Rights & Justice, Portland, argued the cause and filed the brief for respondent on review A. H.

GARRETT, J.

The decision of the Court of Appeals and the judgment of the juvenile court are affirmed.

_____

* Appeal from Multnomah County Circuit Court, Kathryn Villa-Smith, Judge. 327 Or App 61, 533 P3d 1112 (2023).

**GARRETT, J.**

When a juvenile court assumes dependency juris-
diction over a child and the plan is to achieve reunification
of the child with one or both parents, the Department of
Human Services (DHS) is required to make "reasonable
efforts *** to make it possible for the ward to safely return
home." ORS 419B.476(2)(a). We consider the nature and
application of that requirement in the particular circum-
stances of this case.

Both mother and father have cognitive disabilities.
Their child, A, was born prematurely and had special medi-
cal needs. Because of concerns about parents' ability to care
for her, A was placed in substitute care under the jurisdic-
tion of the juvenile court on her release from the hospital,
with the permanency plan at that time being reunification.
After providing services to parents for approximately two
years, DHS requested that the juvenile court change the
permanency plan to adoption. The court did so in August
2022. Parents appealed, and a divided panel of the Court
of Appeals affirmed the juvenile court's judgment. *Dept.
of Human Services v. C. H.*, 327 Or App 61, 533 P3d 1112
(2023). We allowed parents' petitions for review[1] to consider
their arguments that DHS failed, as a matter of law, to make
"reasonable efforts" to make return of the child possible and
that the juvenile court erred in concluding that there was
no compelling reason why adoption would not be in A's best
interest.

The focus of parents' "reasonable efforts" argu-
ment is their contention that DHS was required to tailor
its efforts to parents' unique needs, particularly their cogni-
tive disabilities, and that the agency failed to do so. Parents,
who both are Black, also assert that the agency displayed a
level of cultural and racial insensitivity that made its efforts
unreasonable. As explained below, we agree with parents
that DHS's handling of a dispute between parents and a
foster parent over A's hair care was culturally and racially
inappropriate, and that DHS bears some responsibility

---

[1] Mother and father petitioned for review separately and their cases were
consolidated. Their briefs to this court are virtually identical, and, therefore, we
do not refer separately in this opinion to mother's and father's arguments.

for the breakdown in communications with parents in the months leading up to the juvenile court hearing at which the permanency plan was changed to adoption. However, we conclude that, despite those shortcomings in DHS's handling of the case, the evidence regarding the totality of the agency's involvement with parents is sufficient to support the juvenile court's determination that the agency had made reasonable efforts to make it possible for A to safely return to parents' home. We further conclude that the juvenile court did not err in its determination that there was no compelling reason why adoption would not be in A's best interest. The judgment of the juvenile court and the decision of the Court of Appeals are affirmed.

## I. BACKGROUND

### A. *Circumstances Leading to Dependency Jurisdiction*

A was born prematurely in December 2019, at about 34 weeks, with special medical needs because of her small size. She was placed in the hospital's neonatal intensive care unit and remained there for about two weeks. Mother was discharged from the hospital two days after A's birth; after her discharge, she and father did not regularly visit A and, when they did, it was only briefly. Based on their observations of mother and father during those two weeks, hospital staff reported concerns to DHS that both parents appeared to have cognitive limitations that would interfere with their ability to care for A and ensure her safety. In addition, mother and father had no stable housing and had been living in a shelter when A was born. DHS also learned that, about four months before A was born, the State of California had terminated mother's and father's parental rights to their two older children, then ages three and one.

Upon A's discharge from the hospital, DHS placed her in nonrelative foster care. DHS filed a petition to bring A within the juvenile court's jurisdiction, alleging that mother's limited cognitive abilities interfered with her ability to safely parent A; that mother's and father's parental rights to their other two children had previously been terminated and the circumstances that led to those terminations had not changed or been ameliorated; that A had special medical

needs that mother and father were unable to meet; and that both parents needed the assistance of the court and DHS to safely parent the child. In February 2020, father admitted that he needed the assistance of the court and DHS to safely parent A. The juvenile court then issued an order establishing dependency jurisdiction as to father based on that allegation. In that order, the court directed father to enroll in parenting classes, obtain stable and suitable housing, maintain regular visitation, maintain contact with DHS, participate in services, and attend A's medical appointments.

Mother made no admissions at that time, and the remaining allegations in DHS's petition, pertaining to her specifically, were held in abeyance because DHS had moved for the appointment of a guardian *ad litem* for her. The court eventually granted that motion in September 2020, and a guardian *ad litem* was appointed.

Parents' caseworker, Udlock, referred mother for a neuropsychological examination with Dr. Guastadisegni. In a January 2021 report, Guastadisegni explained that mother's IQ scores were within the "extremely low range" and that mother's testing was consistent with a neurocognitive disorder. He noted that mother exhibited executive functioning deficits, struggled to process two or more pieces of information at once, and was easily confused. Guastadisegni recommended that mother be referred for developmental disability services. He also recommended that mother be provided social service assistance to help her find stable housing, individual counseling to help her address her history of life instability and to help her acquire life skills, and hands-on parenting training. Guastadisegni explained that mother would need information to be presented to her in a graduated manner, that she would not be able to understand information and instructions without repetition, and that she would be best served with written summaries of information so that she could review it repeatedly.

Ultimately, Guastadisegni concluded that, at the time of the evaluation, mother was unable to be an independent parenting resource for A, due to a "constellation of problems," including her lack of appreciation of her cognitive limitations and the lack of a support network. He observed

that, because of mother's intellectual disability, she would always have limitations, but he expressed reluctance to conclude that mother's disability would prevent her from ever becoming an adequate parent. Nonetheless, he stated that it would be more realistic for mother to be the "non primary co-parent in the home with her child, with a caregiver that is the identified responsible parent."

Guastadisegni also stated that, if A were returned to mother's care, in-home services would be needed, as mother would need "substantial support" to function, to make appointments, and to follow through with expectations. He described several factors for measuring mother's progress in acquiring the ability to function independently that would be necessary for independent parenting, including demonstrating the ability to attend her various appointments and follow through with expectations; maintaining a clean home and taking care of daily tasks such as grocery shopping; attending all her scheduled visits with A; displaying independent parenting skills without prompting, guidance, and oversight; communicating with A's caregivers and service providers and showing that she understands A's challenges and what needs to be done for her; and meeting A's needs, including arranging appointments and following up with service providers.

In February 2021, the juvenile court issued a judgment establishing dependency jurisdiction as to both parents, after mother's guardian *ad litem* admitted that mother's cognitive disability interfered with her ability to independently and safely parent A and to provide A with stable and suitable housing and that mother needed assistance to develop a support system necessary for her to safely parent the child.[2] The court ordered parents to, among other things, participate in A's appointments, maintain regular visitation with A, enroll in hands-on parenting classes, and obtain stable and suitable housing. In addition, mother was

---

[2] The February 2021 jurisdiction order also was based on father's admissions that A was born premature with specialized medical needs, that father needs the assistance of the court and DHS to provide support and services for him to safely parent A, that father's residential instability interfered with his ability to safely parent A, and that father did not understand how mother's cognitive limitations affected her ability to independently and safely parent A.

ordered to begin individual counseling and to work with a parent mentor. Father was ordered to undergo a psychological evaluation and to comply with the COVID-19 safety guidelines imposed by each service provider.

Udlock referred father for an evaluation with a psychologist. After father missed the first two scheduled assessment dates, the psychologist refused to schedule another appointment. DHS then arranged an appointment with a different psychologist, Dr. Duncan, and the assessment was eventually completed in September 2021. Duncan reported that father's IQ scores were, like mother's, in the extremely low range, which significantly interfered with his "daily functioning and parenting capacities." He noted that father had difficulty remembering or understanding the need to follow through with recommended parenting services and that, historically, father's engagement in those services had been poor. Duncan also observed that father had "limited insight" into either mother's cognitive deficits or A's developmental needs. Duncan stated that father would need assistance and support to optimize his daily functioning and his ability to become an adequate parent. He recommended that father be referred for developmental disability services, that he participate in individual counseling with a counselor who had experience treating people with intellectual disabilities, and that he receive parent education focusing on his and A's special needs.

B.  *Services Offered to Mother and Father and Their Participation in Those Services*

1.  *Services provided beginning in 2020, after the juvenile court's dependency jurisdiction order as to father*

After the juvenile court took dependency jurisdiction in February 2020 as to father, DHS began to offer father services addressing the basis for jurisdiction that had been identified at that point—that father was unable to meet A's special needs and he needed assistance to safely parent A—and addressing the court's order with respect to actions that father was required to take, including, as noted, enrolling in parenting classes, obtaining stable and suitable housing, maintaining regular visitation, maintaining contact with

DHS, participating in services, and attending A's medical appointments.[3]

Udlock encouraged both parents to attend A's medical appointments and attempted to facilitate their attendance, but neither parent went to any of those appointments. DHS also began providing regular visits with A, supervised by a Social Service Assistant (SSA). Initially, parents attended the scheduled in-person visits, but after in-person visits were suspended because of COVID-19 in March 2020, parents did not participate in virtual visits, although DHS staff had offered in-person assistance to set up the calls. For several months after that, parents did not answer calls from or initiate any contact with DHS staff, although DHS continued to reach out and leave messages for them, and they had no contact at all with A.

Udlock also made multiple referrals for services.[4] Parents insisted on participating in all services together; therefore, all DHS referrals were made for both parents together. For that reason, some services were not available to them. For instance, they were ineligible for most hands-on parenting groups.

In May 2020, Udlock referred parents to group parenting classes through Family SkillBuilders, but parents did not participate in those services. Parents also were referred for parent training services at the Center for Family Success. They completed the intake process for that program, but ultimately failed to participate in the sessions; those services were discontinued in August 2020. Udlock considered and rejected other referrals for parent training services, because the facilities required compliance with COVID-19 safety guidelines and parents, particularly father, refused to comply.

---

[3] Because the court did not yet have jurisdiction as to mother, it could not and did not order mother to participate in services at that time. However, mother accompanied father on his visits with A.

[4] As described by a witness at the permanency hearing, a "referral" is the way in which the case worker connects a parent to a service; generally, the case worker determines which services will be helpful to the parents and then calls the service provider to explain what type of help is needed and to give the service provider the parent's contact information. The service provider then contacts the parents to set up services. From there, it is up to the parent to remain in contact with the service provider and to follow through in participating in the offered service.

In October 2020, parents' in-person visits with A through DHS resumed, supervised by an SSA. Parents failed to attend about half the scheduled visits, giving no advance notice that they would not appear. When they did participate, father refused to comply with DHS's COVID-19 safety guidelines, despite having had the reason for those precautions explained to him repeatedly.

2. *Services and assistance provided after the February 2021 dependency judgment*

After the juvenile court issued the February 2021 dependency judgment, which asserted dependency jurisdiction as to both mother and father and included additional actions that mother and father were required to take to ameliorate the bases for jurisdiction, Udlock referred parents for various additional services, including developmental disability services, parent training, counselling, parent mentoring, and assistance in finding stable housing. Parents participated in some of those services but not in others.

a. Disability services

Udlock began efforts to obtain disability services for parents in February 2021, as recommended by Guastadisegni and Duncan. Eventually, he referred both parents to Multnomah County Intellectual and Developmental Disability Services (DDS). Mother was approved for that service in the summer of 2021, and she was assigned a case manager and later a service coordinator. The case manager informed mother that, in order for DDS to refer mother to funded services by paid providers who could assist her, she would have to complete a needs assessment. Mother met with the case manager and the service coordinator several times to complete that assessment. At one of those meetings, mother told her DDS service coordinator that she was willing to complete the assessment, but she wanted to focus only on obtaining affordable housing. Mother never completed the assessment, and she did not engage in any of the funded services offered by DDS.[5] Father was approved for DDS in the fall of 2021. He missed his first appointment. Although

---

[5] Sometime before the permanency hearing in July 2022, mother indicated to a DDS service coordinator that she wanted to avail herself of DDS's short-term rental assistance. The DDS service coordinator confirmed that mother could

he attended his second appointment in October 2021, he did not attend subsequent appointments and did not participate in any disability services available through DDS.

      b.   Visitation and parent training

      The SSA-supervised visits, which had resumed in October 2020, continued throughout 2021 and into early 2022. Parents' attendance became considerably less consistent beginning in February 2022, with parents eventually failing to respond to DHS's attempts to schedule visits. The SSA referral was eventually closed because of the missed visits.

      In February 2021, Udlock referred parents to The Family Room, which offered extra visitation with hands-on parent-training support from staff. Parents did not follow up, and the referral was closed. Parents were referred to The Family Room again in May and were informed that an opening for them would become available in September. In July, however, father physically assaulted mother in the parking lot of the shelter where parents were living. As a result, The Family Room would not permit both parents to attend its program at the same time. Parents declined to participate separately, and the referral was closed.

      Parents did engage in some parent-training services. Udlock referred parents to Family United, which provided parenting education and coaching. In response to Udlock's inquiries about Family United's ability to work with parents given their cognitive limitations, the Family United parenting coach stated that Family United had substantial experience working with parents with an array of learning barriers and would strive to present information in a way that parents understood. The Family United parenting coach routinely reminded parents about upcoming visits and education sessions, and parents participated consistently in the Family United program. They successfully completed that program in May 2021.

      Parents were re-referred to the program in July. At that time, the Family United parenting facilitator, Nichole

---

qualify for short-term rental assistance even though she could not access the funded services, for which a needs assessment was required.

Mills, reported that she had "encountered some challenges with [father] around his own ability to understand, remember information and problem solve," which she wanted to work on. She also cautioned that Family United was "probably not the best fit" for helping father to understand how mother's cognitive limitations affected her ability to safely parent A. At the same time, Mills stated that Family United was open to having a DDS worker attend parent training sessions and work with parents to help them gain the necessary skills. Because neither parent ultimately engaged with DDS, however, no disability services worker attended parents' Family United sessions. Parents completed the Family United program again in the fall of 2021, and the visitation notes from parents' sessions described both mother and father as loving and attentive parents.

In October 2021, Udlock again referred parents to the Center for Family Success for more in-person parenting training. Parents participated consistently in that program as well. However, the sessions were suspended for two months, in May and June 2022, while the person who transported A and supervised the visits, Michelle Wright, was out on family leave. By then, a new caseworker, Jamie Ruiz, was involved, having been assigned to parents' case in March 2022. During May and June, Ruiz made two separate referrals for SSA-supervised visits, which involved transporting A to supervised visitation at the DHS offices. Parents did not return the SSA's calls. On at least one occasion, the SSA set up a visit with A and transported her to DHS's offices, but parents did not attend. Eventually those SSA referrals were closed. Parents did not see A at all during the two months that Wright was out on family leave. When Wright returned, the sessions with the Center for Family Success resumed, and parents continued to participate in that program through to the time of the July 2022 permanency hearing. Wright consistently reported that the visits went well and both parents were affectionate with A.

c. Counseling

Udlock referred both parents for counseling with Wolf Pack Counseling and Therapeutic Services in May 2021, which provides, among other things, domestic violence

intervention, various kinds of parenting support, and mental health counseling. Mother had three in-person meetings, which father attended as well, and one telephone conversation with a Wolf Pack counselor in December 2021. The Wolf Pack counselor noted that parents had expressed interest only in housing support; they did not access or inquire about any of the other support services that Wolf Pack could offer. The counselor also noted that, although she had repeatedly explained to parents the purpose for their referral to Wolf Pack and why their participation in counseling was essential if they wanted to have A returned to their care, parents appeared confused and did not retain the information that the counselor gave them. Moreover, parents' responses reflected an apparent lack of understanding of their own needs or the expectations placed on them by the court for A's return. Mother made no further contact with the counselor, and the referral was closed.

Father was unable to engage in counselling services on his own behalf with Wolf Pack because he did not have medical insurance. Wolf Pack accepted payment through the Oregon Health Plan (OHP), and Udlock encouraged father to apply for insurance through OHP. In a December 2021 permanency order, the juvenile court ordered father to apply for insurance through OHP. DHS provided services to facilitate father's enrollment in that plan, including providing him with the necessary paperwork, offering assistance in filling out the paperwork, and repeatedly reminding father of the importance of enrolling, but father never applied for coverage, and he never engaged in counselling services.[6]

### d.   Parent mentoring

In February 2021, Udlock referred mother to a parent mentor with Morrison Child and Family Services (Morrison). Mother met with the parent mentor weekly for

---

[6] One of the DHS referrals for assistance in obtaining insurance was to the Blackburn Center, which provides medical and mental health services. The Wolf Pack counselor also directed father to the Blackburn Center. Father told the counselor that he did not want to spend his day off dealing with signing up for insurance. And he told Udlock that he did not want to apply for insurance because he felt that he did not need it at that moment. Udlock reminded father that having insurance was necessary to pay for counseling, which, in turn, was an important step in ensuring that his daughter could come home. According to Udlock, father responded that "he didn't like people knowing his issues."

six months in 2021. Mother's parent mentor assisted her in her search for affordable housing, transportation, and visitation, among other things. In January 2022, DHS again referred mother to a parent mentor, but that referral was closed due to lack of contact. Father also was referred to a parent mentor with Morrison. That mentor tried to reach father twelve times by phone and many more times by text during October 2021, but father rarely responded and did not attend any of the scheduled meetings. The mentor closed the referral in early November 2021.

e.   Assistance in finding stable housing

Parents did not have consistent housing at any point while A was in substitute care. Udlock made several referrals to help parents secure consistent and stable housing, but those efforts were unsuccessful, mainly through no fault of parents. Mother's parent mentor provided help and support during their six-month interaction, including helping her to apply for a housing voucher and paying the application fee with New Columbia, which offered low-income housing. However, that program was closed to new applicants at that time. Father's parent mentor could also have helped the couple find a suitable home, but, as noted, father did not engage with the parent mentor.[7]

In August 2021, mother's Morrison parent mentor helped parents apply for a Home Forward housing voucher and paid mother's $45 application fee to join the waiting list. Mother's mentor could not pay father's application fee, because he was not engaged in mentoring services with Morrison. Father's lawyer asked Udlock whether DHS could pay the application fee. The Home Forward waiting list at that time was for low-income housing that would require parents to pay $876 a month in rent. Udlock expressed reluctance to seek agency funding to pay the application fee for father to join that waiting list unless parents could demonstrate that they would be able to pay the rent.[8]

---

[7] In the summer of 2021, Udlock referred parents to My Father's House, a shelter that accepted families, but that referral was closed because parents did not meet its application conditions.

[8] Ultimately, Family United paid the fee for father's application. However, the waiting list for the program offering one- and two-bedroom apartments was

At a family decision-making meeting[9] in August, father's lawyer asked Udlock to refer parents for a housing voucher for Section 8 subsidized housing with the Family Unification Project (FUP). As noted, parents are Black, and FUP, which describes itself as a "culturally specific program that supports Child Welfare System involved families to secure safe and stable housing," is specifically aimed at helping families of color find housing. Udlock appeared to be unaware of that program and offered to look into whether a voucher would be available. A week later, Udlock reported to parents that they would be sixteenth on the waiting list if he referred them for an FUP voucher. A month later, in September 2021, at father's lawyer's persistent urging, Udlock made the referral, but it was denied because no vouchers were available at that time.

In December 2021, Wright, with the Center for Family Success, referred parents to Relay Resources, which also provides affordable housing. And finally, Ruiz testified that, about a week before the hearing, she had learned that new FUP vouchers had become available and that she was working on an updated application for parents. However, she testified, she could not complete the referral process without parents' assistance and parents had not been returning her phone calls.

C.  *Relationship Between Parents and DHS Caseworkers and the Resource Parent; Communications Breakdown*

Shortly after mother started hands-on parent training through the Family United program in February 2021, she noticed that A's hair was dry and rough. In March, mother began bringing hair products and tools to visits and

---

closed and Home Forward would not take additional applications until the waiting list reopened.

[9] Family decision-making meetings are used in cases in which a child is in substitute care for more than 30 days. ORS 417.368. The term "family decision-making meeting" is defined as "a family-focused intervention facilitated by professional staff that is designed to build and strengthen the natural caregiving system for the child," and the purpose of such meetings is to "establish a plan that provides for the safety, attachment and permanency needs of the child." ORS 417.365. The family decision-making meetings in this case were generally attended by the caseworker, the court-appointed special advocate, the parents, the parents' lawyers, the child's lawyer, and the case managers and services coordinators for the various services that the parents were participating in.

began moisturizing A's hair and braiding it during each visit. Over time, the condition of A's hair improved, and the hair care routine helped mother and A to bond.[10] However, A's foster mother at that time, who was White, believed that A was bothered by the braids, because she rubbed her head and pulled at the braids from time to time, and the foster mother removed the braids after each visit. Later in March 2021, the Family United parenting facilitator, Mills, sent a letter to Udlock, the parents' lawyers, and mother's guardian *ad litem*, explaining that the foster mother had requested that mother no longer braid A's hair during the visits, because A did not like the braids and it was taking the foster mother about 40 minutes to remove them. Mills noted that hair can be "a sensitive subject for folks as it concerns ethnicity and cultural differences" and that she wanted to acknowledge the foster mother's concerns "while not also stripping these biological parents of part of their identity and the opportunity for them to share in some of these cultural values with their daughter." Mills also noted that "hair care time" during the visits was a good experience for parents and A and a good opportunity for bonding. Mills suggested that parents attend to A's hair once a week, which would mean that the foster mother would have less hair maintenance to do if she were to leave the braids in, and she offered to recommend videos and literature for the foster mother to learn more about hair care for Black children.

In May 2021, the foster mother asked Udlock to have DHS arrange and pay for a hair consultation for A, which would educate the foster mother on hair care. Udlock indicated that he had started that process, but the consultation did not take place until August 2021.[11] Meanwhile, the foster mother continued to remove the braids after visits.

_____

[10] Family United session notes stated that the family "uses hair combing the braiding of [A's] hair as an intimate bonding opportunity between the three of them. Upkeep and ongoing hair care are important to them."

[11] The hair consultant specialized in "maintaining and styling textured ethnic hair." She assessed the products that the foster mother used to maintain A's hair and concluded that the foster mother had the right products and had been taking good care of A's hair. The consultant showed the foster mother how to shampoo, condition, moisturize, detangle, and style A's hair. She also noted that the foster mother had taken various hair care classes to learn to take care of A's hair. However, she never observed mother styling A's hair, nor did she see A

By July, parents were extremely frustrated with the foster mother for repeatedly removing the braids and with Udlock for failing to do anything about it. The record suggests that Udlock did not speak to the foster mother about parents' views and feelings about A's hair until August 2021, when the matter was raised at a family decision-making meeting. However, by that time, parents felt that Udlock's and the foster mother's disregard of their wishes regarding A's hair had been disrespectful. At the August family decision-making meeting, father stated that he did not want anyone other than mother doing A's hair. Two weeks later, the foster mother agreed to leave A's hair in braids between visits.

Shortly thereafter, in September 2021, father's lawyer wrote a letter to DHS on father's behalf, requesting the assignment of a new case worker because, in father's view, the relationship between Udlock and father had broken down and their poor relationship was undermining his and mother's progress toward reunification. According to the lawyer, there were four principal sources of conflict between father and Udlock. One was father's sense that Udlock had not done enough to assist parents in attaining affordable housing, particularly in failing to arrange for DHS funding to pay the $45 application fee to join the Home Forward waiting list and in failing earlier to attempt a referral for an FUP voucher. The second was that Udlock delayed in referring parents for parenting coaching specifically focused on parents with intellectual disabilities. Third, father felt that Udlock was not as helpful as he could have been in facilitating a meeting between parents and their two older children, after the children's adoptive parents had temporarily relocated to Oregon. The fourth and most important issue was Udlock's failure to resolve the conflict about A's hair when it arose in March 2021. Father's lawyer stated that those incidents had led father to believe that DHS did not wish to see him reunited with his daughter. In addition, the lawyer reported that father felt that Udlock's attitude toward him had been condescending and disrespectful and that the relationship was irretrievably damaged. He therefore requested

---

after mother had styled her hair, which might have permitted her to evaluate the validity of the foster mother's concern about the child's discomfort.

that DHS replace Udlock with a "culturally specific case-worker for this family."

In an October 2021 letter, DHS denied that request, stating that "it would not be in the best interest of the case" to replace Udlock, because of "where the case is in the time-line." That is, the letter stated, DHS had requested a change in the permanency plan from reunification to adoption, and, "if this goes to trial, [Udlock] would be a key witness." Instead, DHS proposed coaching Udlock "into being more effective in his communications with [father]." The letter also pointed out that, in DHS's view, the issues that father's lawyer had identified as the sources of conflict had been rectified.

In March 2022, four months before the permanency hearing, DHS did replace Udlock as the family's caseworker with Ruiz.[12] Ruiz never established a relationship with either parent. She had not met either parent in person before the permanency hearing in July, and she had talked to mother on the phone only once. She had called and left messages for both mother and father several times in March, when she was first assigned to the case, but neither parent answered or returned her calls. After the first month, Ruiz called parents about twice a month, sometimes multiple times in one day, and left both voice and text messages, but neither parent returned those calls or responded to the messages. Ruiz made no effort to contact parents in writing or visit parents where they were living, and she did not ask either of parents' lawyers or mother's guardian *ad litem* for help getting in contact with parents. Ruiz did not speak to any of the service providers that Udlock had arranged to work with parents other than Wright, from the Center for Family Success. And, other than the referrals for SSA-supervised visits previously mentioned, Ruiz did not make any new referrals for services for parents during that period.

D.  *The Child's Condition*

By the time of the permanency hearing in July 2022, A had been in substitute care for over two and a half

_____

[12] The record does not reflect whether DHS's decision to replace Udlock with Ruiz was related to father's request.

years. As noted, the couple who had adopted A's older siblings relocated to Oregon in 2021. After they did so, they took the steps necessary to become certified as a placement option for A. By March 2022, that process was complete, and DHS moved A into their home to live with her siblings.[13] The couple also indicated that they were interested in adopting A. At the time of the hearing, A was doing very well; she was happy and healthy and attached to her siblings and their adoptive parents. In addition, DHS had identified an aunt in California who also was interested in adopting A, and it had completed its assessment of her as an adoptive resource. The Family Report provided to the juvenile court before the permanency hearing stated that, if the court were to change the permanency plan to adoption, DHS would present both the aunt and the family who had adopted A's siblings as potential adoptive resources.

E.  *The Permanency Hearing and the Juvenile Court's Ruling*

The juvenile court conducted a permanency hearing in July 2022, at which DHS requested that the court change the permanency plan for A from reunification to adoption. DHS called only Ruiz to testify. Neither mother nor father testified or called any witnesses. Ruiz described DHS's efforts to assist parents in ameliorating the bases for jurisdiction, parents' failure to obtain stable housing or participate in many of the services offered, and parents' failure to adjust their circumstances to make possible the safe return of A to their care. Parents' cross-examination focused on Ruiz's own lack of effort to make contact with parents during the four months preceding the hearing, on establishing that parents were loving and attentive during supervised visitation and that A had an emotional bond with them, and on DHS's failure to resolve the conflict over A's hair.

At the conclusion of the hearing, the juvenile court took the matter under advisement. In August, the court issued an order changing the permanency plan to adoption.

---

[13] Ruiz testified at the permanency hearing that DHS made the decision to move A from the first foster mother's home because she was becoming very attached to the foster mother and DHS understood that that would not be a permanent placement, whereas the family who had adopted A's siblings potentially would be.

In its findings of fact, the court observed that parents had regularly attended supervised visits with A and that those visits had gone well, but that parents had not advanced to unsupervised visits or demonstrated that they could care for A independently. According to the court, "the most significant barrier has been parents' lack of follow through and unwillingness to attend services." The court mentioned that several referrals for services had been closed because of parents' failure to follow through or participate. Finally, the court noted that both parents' psychological evaluations raised concerns about parents' ability to parent independently, and that parents had made very little progress despite the services offered and "still ha[d] no understanding of how their intellectual disability interferes with daily functioning and parenting capacity."

In addition, the court determined that DHS had made reasonable efforts to reunify the family; that, despite those efforts, A could not be safely returned to parents' care; and that further DHS efforts would not make it possible for A to return home within a reasonable time. The court concluded that the current plan of reunification was not in A's best interest and that termination of parents' parental rights was in the child's best interest. On that point, the court also ruled that parents had not established that there was a compelling reason not to change the permanency plan from reunification to adoption, reasoning that parents were not participating in services that would make it possible for A to safely return home within a reasonable time, no other permanent plan would be better suited to meet A's needs, and DHS had made reasonable efforts to make it possible for the child to return home safely.

F.  *Parents' Appeal*

Parents appealed the juvenile court's ruling, challenging the juvenile court's determination that DHS had made reasonable efforts to reunify the family, its determination that parents had made insufficient progress in ameliorating the bases for jurisdiction, the court's ruling that there was no compelling reason not to change the permanency plan to adoption, and its decision to change the permanency plan to adoption. The Court of Appeals affirmed

in a written decision. Although the Court of Appeals was critical both of DHS's insensitivity in handling the conflict between parents and the foster mother over A's hair and of the lack of effort by Ruiz in the four months preceding the permanency hearing, the court ultimately concluded that, considering the totality of DHS's efforts over the entire course of the case, DHS's efforts had been reasonable. The court also rejected parents' remaining arguments, concluding that the juvenile court did not err in ruling that parents had not made sufficient progress in ameliorating the bases for jurisdiction and that the juvenile court correctly concluded that parents had failed to prove that there was a compelling reason that adoption would not be in A's best interest or that a different plan would be more appropriate.

Judge Jacquot dissented. In her view, DHS's efforts had been insufficient because the agency failed to respond in a more timely and culturally sensitive way to the conflict about A's hair or to take action to repair the damage done to parents' relationship with DHS.

## II.   DISCUSSION

On review, parents raise two arguments: They contend that the juvenile court erred in determining that DHS's efforts to reunify the family were reasonable, and they contend that the juvenile court erred in determining that parents had failed to establish that there was a compelling reason to conclude that adoption would not be in the child's best interest. Parents do not pursue their arguments, made before the Court of Appeals, that (1) the juvenile court erred in concluding that parents had not made sufficient progress to enable A to return safely home within a reasonable time, and (2) a different permanency plan short of adoption would be more appropriate.

### A.   *The Reasonable-Efforts Determination*

#### 1.   *Standard of review*

As we recently explained in *Dept. of Human Services v. Y. B.*, 372 Or 133, 145, 546 P3d 255 (2024), ORS 419B.476 governs the conduct of permanency hearings and changes to permanency plans. In this case, at the time of the hearing,

the permanency plan for A was reunification. In such cases, the juvenile court is directed to "determine whether [DHS] has made reasonable efforts *** to make it possible for the ward to safely return home and whether the parent has made sufficient progress to make it possible for the ward to safely return home." ORS 419B.476(2)(a). ORS 419B.476 also provides that, in making that determination, "the court shall consider the ward's health and safety the paramount concerns." *Id.* If the court concludes that DHS has made reasonable efforts to reunify the family and that the parents have not made sufficient progress to permit the safe return of the child, then the court may change the permanency plan to something other than reunification, such as, in this case, adoption. *See* ORS 419B.476(5)(b)(B)-(E).[14]

DHS bears the burden of proof at a permanency hearing, and it must prove the facts supporting a change in the permanency plan by a preponderance of the evidence. ORS 419B.476(1) (requiring the permanency hearing to be conducted in accordance with ORS 419B.310); ORS 419B.310(3)(a)(A) (requiring that "the facts alleged in the petition showing the child to be within the jurisdiction of the court *** must be established," as pertinent here, "[b]y a preponderance of competent evidence"); *Y. B.*, 372 Or at 135-36 (so stating).

A preliminary question presented by this case is the standard of review that applies to our analysis of the juvenile court's determination that DHS made reasonable efforts for purposes of ORS 419B.476(2)(a). In a dependency case in which we do not review *de novo*,[15] we are bound by the juvenile court's factual findings if there is any evidence in the record to support them. *Y. B.*, 372 Or at 136. We review

---

[14] In addition, ORS 419B.476(4)(c) gives the juvenile court discretion to continue the current plan of reunification if it determines that further efforts may make possible the child's safe return "within a reasonable time" and, if it so determines, to order the parents to "participate in specific services for a specific period of time and make specific progress within that period of time[.]" In this case, the juvenile court determined that further efforts would not make possible the child's safe return to parent's care, and parents do not challenge that decision here.

[15] No party requested *de novo* review in this case under ORS 19.415(3)(b) (giving the court discretion to conduct *de novo* review in equitable actions or proceedings other than termination of parental rights proceedings), either in the Court of Appeals or in this court. We also elect not to hear the matter *de novo*.

the juvenile court's legal conclusions for errors of law, and, in so doing, we consider the evidence in the light most favorable to the juvenile court's disposition to determine whether it supports that court's legal conclusions. *Id.*

We have not previously addressed whether a juvenile court's determination that DHS made "reasonable efforts" is a factual finding or a legal conclusion. We recently considered a similar question, however, in *Y. B.*, which concerned a juvenile court's determination that a parent had not made "sufficient progress" under the same statute to enable a child's safe return. 372 Or at 148. In that context, we concluded:

> "The nature of the competing interests at stake, as well as text and context calling for the application of a legal standard, persuade us that the juvenile court's 'determination' of sufficient progress is a legal conclusion that this court reviews for errors of law."

*Id.* at 149. At the same time, we recognized that "the sufficient-progress determination, although ultimately a legal conclusion, is heavily fact-driven." *Id.* The court approved of the analysis that the Court of Appeals had employed in a similar context—specifically, a juvenile court's determination under ORS 419B.100(1)(c) that a child's condition or circumstance is such as to "endanger" the child's welfare. *Id.* at 150-51. The Court of Appeals had explained that, in that situation,

> "we view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the trial court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome. Specifically, with respect to a juvenile court's determination under ORS 419B.100(1)(c), we: (1) assume the correctness of the juvenile court's explicit findings of historical fact if these findings are supported by any evidence in the record; (2) further assume that, if the juvenile court did not explicitly resolve a disputed issue of material fact and it could have reached the disposition that it reached only if it resolved that issue in one way, the court implicitly resolved the issue consistently with that disposition; and (3) assess whether the combination of (1) and (2), along with nonspeculative inferences, was

legally sufficient to permit the trial court to determine that ORS 419B.100(1)(c) was satisfied. \*\*\* [O]ur function is limited to determining whether the evidence was sufficient to permit the challenged determination."

*Dept. of Human Services v. N. P.*, 257 Or App 633, 639-40, 307 P3d 444 (2013). In part because this court viewed the determination under ORS 419B.100(1)(c) as comparable to the sufficient-progress determination under ORS 419B.476(2)(a), we adopted the Court of Appeals' approach in *N. P.* for reviewing the similarly fact-driven legal sufficient-progress determination, explaining that we would apply the following analytical paradigm to such review:

> "[A]ppellate courts are bound by the juvenile court's factual findings as to what efforts DHS has made and what actions the parent has taken, so long as there is any evidence in the record to support them, and we assume that the juvenile court found all facts necessary to its ruling, even if it did not do so explicitly. But the juvenile court's determination that a parent has or has not made 'sufficient progress' to allow the child to return home safely is a legal conclusion that appellate courts review for errors of law, and they do that by examining whether the facts explicitly and implicitly found by the juvenile court, together with all inferences reasonably drawn from those facts, were legally sufficient to support the juvenile court's determination."

*Y. B.*, 372 Or at 151.

 *Y. B.* dealt with the juvenile court's determination of a parent's "sufficient progress" under ORS 419B.476(2)(a), but our reasoning applies with equal force to the review of a juvenile court's determination under the same provision concerning whether DHS has made "reasonable efforts" to make the child's safe return home possible. First, as *Y. B.* explained, under ORS 419B.476, both "reasonable efforts" and "sufficient progress" describe the legal standard that must be met to justify the juvenile court's decision to maintain or change the permanency plan of a ward of the court. 372 Or at 149. Second, the nature of the reasonable-efforts determination and the competing interests at stake are identical to those implicated by the sufficient-progress determination. Therefore, as with the sufficient-progress determination, we conclude that the juvenile court's determination

of reasonable efforts also is a legal conclusion that this court reviews for errors of law. And, because the reasonable-efforts determination, like a sufficient-progress determination, is heavily fact-driven and statutorily prescribed, we conclude that it is appropriate to use the analytical paradigm that we adopted in *Y. B.* to review that determination.

2.   *The meaning of the phrase "reasonable efforts"*

The phrase "reasonable efforts" is not defined in the statute, and this court has not previously addressed the meaning of that phrase. We are thus presented with a question of statutory interpretation, which we resolve in accordance with *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009) (court determines legislative intent by considering text in context, together with any helpful legislative history).

"Reasonable" modifies "efforts" in ORS 419B.476(2)(a) and thus describes the degree of effort that must be expended. As pertinent here, *Black's Law Dictionary* defines "reasonable" as "fair and proper under the circumstances" and "within sensible or rational limits; not excessive; moderate." *Black's Law Dictionary* 1520 (12th ed 2024); *see also Webster's Third New Int'l Dictionary* 1892 (unabridged ed 2002) (similarly defining "reasonable" as "being or remaining within the bounds of reason : not extreme : not excessive"). *Black's* also defines the phrase "reasonable efforts" as "[o]ne or more actions rationally calculated to achieve a usu. stated objective, but not necessarily with the expectation that all possibilities are to be exhausted." *Black's* at 1520. Finally, we note that the policy statement that the legislature included in the statutes governing the juvenile courts provides, among other things, that it is the policy of this state "to offer appropriate reunification services" to parents to provide them with the opportunity to adjust their circumstance to make it possible for the child to safely return home. ORS 419B.090(5). Based on the dictionary definitions and that policy statement, we understand "reasonable efforts" as used in ORS 419B.476(2)(a) to require the court to take into account what is appropriate under the circumstances of the case.

Moreover, the obligation that DHS make "reasonable efforts" coexists with the requirement that parents make "sufficient progress" to make it possible for the ward to safely return home. ORS 419B.476(2)(a). It follows that the agency's "efforts" must be those reasonably calculated to assist parents in meeting that goal.[16] In other words, the reasonableness of DHS's efforts must be evaluated in light of the bases for jurisdiction identified in the juvenile court's judgment. Efforts are reasonable when the agency has taken appropriate steps under the circumstances to give parents a full and fair opportunity to remediate the bases for jurisdiction to become at least minimally adequate parents (and, for purposes of a permanency hearing, to show that they have made sufficient progress to make it possible for the child to safely return to their care).

Both DHS and parents take the view that, when evaluating the reasonableness of DHS's efforts to make possible a child's safe return home, we must consider the totality of the circumstances. Although this court has never said as much in so many words, we agree. Such an approach is consistent with how we have construed the word "reasonable" in other contexts, including in the juvenile code. For instance, in *State v. Iseli*, 366 Or 151, 165, 458 P3d 653 (2020), the court used that approach in the context of determining, under OEC 804(1)(e), whether a witness was "unavailable" because the proponent was unable to procure the witness's attendance "by process or other reasonable means." *Iseli*, in turn, cited *State ex rel Juv. Dept. v. Smith*, 316 Or 646, 853 P2d 282 (1993), which used the totality-of-the-circumstances approach in the juvenile context, for that proposition. In *Smith*, the court held that, to establish juvenile court jurisdiction over a child under *former* ORS 419.476 (1991), *repealed by* Or Laws 1993, ch 33, § 373, the juvenile court must "consider the totality of the circumstances presented in the case" to determine whether "a reasonable likelihood of harm" to the child exists. 316 Or at 652-53.

---

[16] Legislative history suggests that the legislature chose the phrase "reasonable efforts" to ensure that DHS's efforts were evaluated based on the unique circumstances of each case. Tape Recording, Senate Committee on Crime and Corrections, SB 689, Apr 2, 1997, Tape 55, Side B (testimony of Nancy Miller, Chair of the Citizens Review Board, explaining that "reasonable efforts" is difficult to define and must be determined on a case-by-case basis).

We also view the totality-of-the-circumstances approach as appropriate given the nature of dependency cases. The goal of DHS's efforts is to assist parents to adjust their circumstances so that their parenting is not "seriously detrimental" to the child and thus, to make the child's safe return home possible. *See* ORS 419B.504 (parental rights may be terminated if court finds that a parent is unfit by reason of conduct or condition seriously detrimental to the child); ORS 419B.476(2)(a) (directing DHS's efforts toward making possible the child's safe return home); *State ex rel Dept. of Human Services v. Simmons*, 342 Or 76, 78, 149 P3d 1124 (2006) (issue presented was whether state has shown that, at time of termination proceeding, mother was unfit and unable to be a "minimally adequate" parent to her daughter). Therefore, when the plan is reunification, parents must be given a genuine and fair opportunity to adjust their conduct and become at least minimally adequate parents. And assessing the reasonableness of DHS's efforts to assist parents in that endeavor is most fairly accomplished by inquiring into DHS's efforts over the course of the agency's involvement with the family. For those reasons, we conclude that, in assessing the reasonableness of DHS's efforts to make possible the safe return of a child to the parent's care, the court must consider the totality of the circumstances related to that issue.

In addition, parents argue that "reasonable efforts" under ORS 419B.476 are efforts that are specifically tailored to the needs of the family at issue—and that those efforts must account, when necessary, for the needs of parents with disabilities. Parents cite ORS 419B.090(5), which provides that it is the policy of this state

"to offer appropriate reunification services to parents * * * to allow them the opportunity to adjust their circumstances, conduct or conditions to make it possible for the child to safely return home within a reasonable time. The state shall provide to parents and guardians with disabilities opportunities to benefit from or participate in reunification services that are equal to those extended to individuals without disabilities. The state shall provide aids, benefits and services different from those provided to parents and guardians without disabilities, when necessary to ensure

that parents and guardians with disabilities are provided with an equal opportunity under this subsection."

Parents argue that that text and the legislative history of that statute demonstrate that, by requiring "appropriate" services, the legislature intended to require DHS to ensure that disabled parents have an equal opportunity to reunite with their children as do nondisabled parents. According to parents, that means that reunification efforts under ORS 419B.476(2)(a) are "reasonable" only if DHS tailors those efforts to the needs of the particular family.

DHS does not dispute that point, and we agree. In referring to "appropriate reunification services" and an "equal opportunity" for parents with disabilities to adjust their circumstances to make it possible for their children to return home safely, the text of ORS 419B.090(5) requires services to be tailored so that all parents, including those with disabilities, have the opportunity to benefit from those services. Doing so may entail specific efforts to address barriers to accessing those services that people with disabilities uniquely face. Moreover, the legislative history of ORS 419B.090(5) demonstrates that the wording in that subsection pertaining specifically to parents with disabilities was modeled on requirements from the Americans with Disabilities Act (ADA) and other civil rights laws. Testimony, Senate Committee on Human Services, SB 492, Feb 12, 2019 (statement of Bob Joondeph, Executive Director of Disability Rights Oregon). During a meeting of the Joint Subcommittee on Human Services, Laurie Byerly, with the Legislative Fiscal Office, stated that Senate Bill (SB) 492 "clarifies state policy" that "families with parents who experience disabilities will be treated commensurate with families who don't have disabilities." Video Recording, Joint Committee on Ways and Means Subcommittee on Human Services, SB 492, May 29, 2019, at 16:26 (statement of Laurie Byerly), https://olis.oregonlegislature.gov/liz/mediaplayer/?clientID=4879615486&eventID=2019051209 (accessed Nov 4, 2024). The legislative history also clarifies that the special requirements for disabled parents do not lower the minimum standards required to parent a child, but they do require that, if a parent with a disability "needs a different method of instruction to learn the techniques"

than DHS would normally teach parents, then the parent must be provided instruction by a method "appropriately tailored to be useful to the individual." Exhibit 12, Senate Committee on Human Services, SB 492, Feb 12, 2019 (report accompanying the statement of Bob Joondeph).

3.   *The record in this case supports the juvenile court's conclusion that DHS made reasonable efforts.*

Parents contend that the juvenile court erred as a matter of law in determining that DHS's efforts to reunify the family were reasonable. As already explained, we are bound by the juvenile court's factual findings as to the efforts DHS made and the actions parents took or failed to take, so long as there is any evidence in the record to support those findings, and we assume that the juvenile court found all facts necessary to its ruling, even if it did not do so explicitly. Here, as detailed more thoroughly above, the juvenile court found that DHS's efforts, either directly or through referrals or financial support, included (1) arranging DHS-supervised visitation with an SSA; (2) referring parents multiple times to Family United, the Center for Family Success, and The Family Room for extra visits and hands-on training and support; (3) referring both parents to Multnomah County Developmental Disability Services and connecting mother to a case manager there; (4) referring mother to Wolf Pack for counselling services; (5) referring both parents multiple times to the Morrison Center for a parent mentor; (6) referring father to the Blackburn Center and a parent mentor for help in enrolling in the Oregon Health Plan; (7) providing a psychological evaluation for both parents; (8) assisting parents in trying to find stable housing; and (9) contacting parents repeatedly to encourage them to participate in recommended services and remind them of the importance of doing so. The juvenile court found that "the most significant barrier" to parents' progress in becoming capable of independent parenting was their "lack of follow through and unwillingness to attend services." As detailed above, the record readily supports those factual findings.

The focus of parents' argument on appeal is their contention that DHS's efforts were not "reasonable" because they were not tailored to accommodate parents' particular

circumstances—particularly their intellectual disabilities and their racial and cultural traditions—by providing assistance in a manner that was accessible to parents and accommodated their circumstances. In parents' view, because DHS did not tailor its services in those ways, it did not provide parents with a bona fide opportunity to ameliorate the deficits that caused the juvenile court to take jurisdiction.

Specifically, parents argue that DHS knew that parents' disabilities interfered with their capacity to follow through and access services but, nonetheless,

> "[DHS's] reunification efforts consisted of simply 'referring' parents to outside service providers. \*\*\* And without any cause to believe that parents would be able to do so, [DHS] expected these parents with cognitive disabilities to, without assistance, arrange for and consistently engage in the services those organizations provide."

As examples, parents point to DHS's supposed failure to help father keep track of all his service appointments, its failure to help mother understand the connection between engagement in services and reunification, and its failure to help parents connect with DDS and maintain services there.

Parents also argue that DHS's failure to quickly intervene when the foster mother insisted on removing A's braids, despite parent's repeated pleas for their wishes to be honored, showed racial and cultural insensitivity and undermined parents' relationship with DHS and the foster mother. They contend that DHS's subsequent rejection of father's request for a new caseworker, after being told that father felt that his relationship with Udlock was irreparably damaged, caused parents to question whether reunification was possible or even desired by the agency.

In addition, parents criticize DHS for failing to pursue A's placement with father's mother, based on a department policy prohibiting relatives from serving as foster placements for children if the relative is also providing housing support for the parents.

Finally, parents argue that DHS essentially abandoned parents once it decided to change the parenting plan to adoption. They claim that DHS's efforts were perfunctory

at best before Ruiz was assigned to their case, and in the four months that Ruiz managed the case, DHS completely failed to communicate with parents.

As we will explain, certain of parents' contentions find support in the record, while others do not.

First, if parents' contention that DHS did little more than provide parents with a list of service providers were correct, we might agree that DHS had not made reasonable efforts. But the extensive record in this case shows that DHS did much more than that. It consistently and repeatedly contacted a multitude of service providers in an effort to connect parents to services aimed at ameliorating the bases for jurisdiction and helping them to become minimally adequate parents. In addition, the DHS caseworker and the service providers continually reached out to parents to remind them of the crucial link between engagement in services and return of their daughter; to encourage them to participate in the various services offered; to remind parents of appointments and of the importance of attending them; and to offer them assistance with paperwork, among other things.

Nor does the record support parents' assertion that DHS failed to offer services that were tailored to parents' disabilities. DHS referred both parents for psychological assessments, which led to recommendations for specific services that parents would need to ameliorate the jurisdictional bases for A's wardship. Then, over a period of more than two years, DHS offered parents a wide variety of services to assist them to become minimally adequate parents. As the Court of Appeals observed,

> "the record shows that DHS referred parents to resources that were specifically designed to build a support network for parents and that were tailored to their cognitive limitations. A parent mentor or developmental disability services caseworker could have helped develop support plans and provide referrals to other providers[.] *** DHS worked to ensure that Family United, which engaged in hands-on parenting coaching with parents, knew that mother had intellectual limitations so that they could provide information to mother in a way that she could understand. Family

United was also willing to have an additional developmental disability support worker come to visits to help parents[.] *** Those services, along with the many others ***, were designed to remedy the barriers that parents had to parenting A by providing parents with a support system that was tailored to the way in which parents needed to receive information and assistance."

*C. H.*, 327 Or App at 75-76. The record also shows that DHS made multiple attempts to help parents find stable housing.

Parents' argument is also contrary to the juvenile court's specific findings. The implicit premise of parents' argument is that their intellectual disabilities are what prevented them from completing services, and that DHS should have done more to help them. The juvenile court, however, acknowledged those disabilities but specifically found that the "most significant barrier" to parents' progress was their "lack of follow through and unwillingness to attend services." That factual finding is supported by the record.

In addition, the record does not support parents' contention that DHS was somehow negligent in rigidly enforcing a policy against placing children with relatives who are providing housing to their parents. The juvenile court did not make specific findings about DHS's efforts to place A with father's mother, but the record permits the inference that that policy was not the only reason DHS did not consider father's mother as a placement resource. The record demonstrates that father's mother did not have a relationship with A: she attended only one supervised visitation with the child, and she never attended a hearing in the case or any of the family decision-making meetings. Moreover, Ruiz testified that, although at one point father's mother agreed to be considered as a placement resource, she later withdrew herself from consideration.

As for parents' assertion that DHS wholly "abandoned" them for the ten months preceding the permanency hearing, parents appear to acknowledge that, even after DHS informed parents, in October 2021, that it had decided to pursue adoption, the agency continued to provide services to parents, at least through March 2022. Udlock continued to refer parents to the Center for Family Success

for in-person parenting training; he referred mother to a parent mentor; and, for the entire time he was assigned to parents' case, Udlock continued to attempt to arrange DHS supervised visitation. In addition, other service providers to which parents had been referred continued to contact parents to encourage them to engage in the services. In December 2021, the Center for Family Success referred parents for housing assistance, the parent mentor assigned to father made multiple efforts to contact father before eventually closing the referral, and a Wolf Pack counselor continued to try to reach mother through December 2021.

We agree with parents that DHS's efforts fell off beginning in March 2022, about four months before the permanency hearing, when Ruiz was assigned as their new caseworker. Ruiz initially made multiple attempts to contact parents by phone and text message, but most of those attempts were unsuccessful. From then on, she attempted—unsuccessfully—to contact parents about twice a month, but she never explored other means of reaching them. Given the animosity that had developed between parents and Udlock, Ruiz could reasonably have been expected to make more of an effort to repair the damaged relationship between parents and DHS. But we cannot ignore parents' own share of the responsibility for the lack of communication during that period, during which they failed to return any calls or messages, despite having been ordered by the court to stay in contact with DHS and having been counseled by Wright, their Center for Family Success parenting coach, about the importance of communicating with DHS.

We also acknowledge the validity of parents' argument that DHS poorly handled the conflict with the first foster mother over the braiding of A's hair. DHS allowed the foster mother to disparage parents' attempts to care for A's hair for several months, apparently without pushback. As discussed, parents, and especially father, took Udlock's insensitivity personally; father perceived a lack of respect for mother and him as Black parents and felt that it showed that DHS was not committed to reunification. There is no indication that DHS took any specific steps to disabuse parents of that perception, as it should have.

Although DHS fell short in its handling of that conflict, and although we agree that Ruiz should have done more in the four months preceding the permanency hearing, the reasonableness of DHS's efforts under ORS 419B.476(2) (a) must be evaluated over the life of the case. We conclude, as did the Court of Appeals, that the record of DHS's efforts during more than two years of involvement with the family, together with the record of parents' responses to those efforts, permitted the juvenile court to conclude that the agency had made reasonable efforts to make reunification possible. The crux of parents' argument is that their failure to complete required services is attributable to DHS's insensitivity to their specific needs and circumstances, which led to an irreparable breakdown in their relationship with the agency. But the record permits a contrary inference. The juvenile court made specific findings that, despite the services offered to parents, they "have not been able to advance to unsupervised visits or to demonstrate they are able to care for A independently"; that the "most significant barrier [to parents' progress in adjusting their circumstances] has been [their] lack of follow through and [their] unwillingness to attend services"; that they had made "very little progress" in their ability to independently care for A, despite the services that DHS had provided to them (including services chosen to support them in light of their intellectual disabilities); and that they "still have no understanding of how their intellectual disability interferes with daily functioning and parenting capacity." The record supports those findings.

The totality of the circumstances includes parents' failure to participate in services, return phone calls, or show up for appointments. Although, in general, the reasonable-efforts inquiry is primarily directed toward DHS's conduct and not the parent's, a parent's failure to cooperate can obviously hamper DHS's efforts. For that reason, in determining whether DHS made reasonable efforts, a parent's cooperation is relevant. Here, the record allowed the juvenile court to determine that parents' failure to participate in the many opportunities that DHS made available to them was a more significant barrier to their becoming minimally adequate parents than any failure of effort on DHS's part.

For all of those reasons, we conclude that the juvenile court did not err in determining that DHS made "reasonable efforts \* \* \* to make it possible for the ward to safely return home" as required by ORS 419B.476(2)(a).

B.  *The No-Compelling-Reason Determination*

To understand parents' second challenge to the juvenile court's determination—their argument that the juvenile court and the Court of Appeals erred in determining that parents had failed to establish that there was a compelling reason to conclude that adoption would not be in the child's best interest—a brief explanation of the statutory context for that argument is helpful.

Under ORS 419B.498, which governs the termination of parental rights, DHS is required to file a petition to terminate parental rights when a child has been in substitute care for 15 of the most recent 22 months, unless an exception applies. ORS 419B.498(1)(a). Exceptions include, among other things, that "[t]here is a compelling reason, which is documented in the case plan, for determining that filing such a petition would not be in the best interests of the child or ward." ORS 419B.498(2)(b). For purposes of that statute, "compelling reasons" include, among other things, that "[a]nother permanent plan is better suited to meet the health and safety needs of the child or ward, including the need to preserve the child's or ward's sibling attachments and relationships." ORS 419B.498(2)(b)(B). Under ORS 419B.498, the decision whether to invoke an exception to the strict 15-month timeline for filing a termination petition—as set out in ORS 419B.498(1)—thereby delaying the filing of the termination petition, lies with DHS. And, as the court stated in *Dept. of Human Services v. S. J. M.*, 364 Or 37, 53, 430 P3d 1021 (2018), if DHS invokes an exception under ORS 419B.498(2)(b), then DHS bears the burden of "documenting in the case plan" that the compelling reason exists.

Termination of parental rights also is required when the juvenile court determines at a permanency hearing that a permanency plan should be changed to adoption, because adoption cannot take place until the parents' rights are terminated. *See* ORS 419B.476(5)(b)(B) (if the juvenile court

determines that the plan should be changed to adoption, the order must include when the ward will be placed for adoption and when a petition for termination of parental rights will be filed). Additionally, in the permanency hearing context, when the juvenile court changes a permanency plan to adoption, the juvenile court is required to determine "whether one of the circumstances in ORS 419B.498(2) is applicable." ORS 419B.476(5)(d). This court explained in *S. J. M.* that, in that situation, the decisionmaker is different than in cases arising under ORS 419B.498, but the inquiry is the same. 364 Or at 53. That is, in the permanency hearing context, "the juvenile court, rather than DHS, must make the determination under ORS 419B.476(5)(d)," but, in both scenarios, the party who wishes to show that one of the exceptions in ORS 419B.498(2)(b) applies bears the burden of proof. *Id*.

In this case, parents are the parties seeking to show that one of the exceptions applies, and, as parents acknowledge, it therefore was their burden to show a compelling reason that terminating their parental rights would not be in A's best interest, including, if appropriate, proving that a permanency plan other than adoption is better suited to meet A's needs. ORS 419B.498(2)(b)(B). At the permanency hearing, parents cited the existence of a bond between them and A and made only a general argument that some other unspecified permanency plan would be better suited to A's needs. The juvenile court determined that parents had not met their burden of proof and, therefore, that no compelling reason existed to conclude that termination would not be in the child's best interest. In this court, parents repeat the arguments they made before the juvenile court.

The juvenile court's determination that a compelling reason does or does not exist is a legal conclusion, which we review for errors of law. *S. J. M.*, 364 Or at 56. However, as the court explained in *S. J. M.*, our review of the compelling-reason determination is similar to our review of the court's reasonable-efforts determination and its sufficient-progress determination:

"Whether a 'compelling reason' exists is a legal question, but one dependent on factual findings. Thus, the question before us on review is more properly understood as whether

there was evidence in the record to support the juvenile court's findings of fact upon which its conclusion *** that there was not a 'compelling reason' was based."

*Id*. at 56-57.

The juvenile court did not explicitly make factual findings to support its no-compelling-reason determination. But, as we stated in the context of our review of the reasonable-efforts determination, we assume that the juvenile court found all facts necessary to its ruling, even if it did not do so explicitly. We then examine whether the facts explicitly and implicitly found by the juvenile court, together with all inferences reasonably drawn from those facts, were legally sufficient to support the juvenile court's determination.

Parents reprise their general argument that some other permanent plan would be better suited than adoption to meet A's health and safety needs, but, as noted, they have not suggested that another viable permanent plan exists. The juvenile court determined that parents had not made sufficient progress to allow them to be reunited with their children and that further efforts on the part of DHS would not make the child's safe return home possible within a reasonable time.[17] It follows that parents cannot be parental resources for A. Parents have suggested that guardianship would be better suited to A's needs, but they have not explained why guardianship would be preferable to adoption.

As we have stated, in making a permanency decision, the child's welfare is the court's "paramount concern." A has spent her entire life in substitute care. Even acknowledging parents' bond with A, we cannot say that the juvenile court erred as a matter of law in concluding that it is not in A's best interest to force her to remain in substitute care for an indeterminate additional period while DHS searches for a suitable guardian.

### III.   CONCLUSION

Considering the totality of the circumstances surrounding DHS's efforts to make it possible for A to safely return home, which included the wide variety of services

---

[17] As noted, parents have not challenged those determinations.

offered to parents and the fact that those services were tailored to meet parents' needs, and taking into consideration the effect of the breakdown in the relationship between parents and DHS arising out of DHS's insensitivity to the conflict between them and the first foster mother over A's hair, we conclude that the juvenile court did not err as a matter of law in determining that DHS's efforts were reasonable under ORS 419B.476. In addition, we conclude that the juvenile court did not err as a matter of law in determining that there was no compelling reason not to change the permanency plan to adoption.

The decision of the Court of Appeals and the judgment of the juvenile court are affirmed.