238 April 30, 2025 No. 384

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

In the Matter of M. M. J.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

J. J.,
*Appellant.*

Marion County Circuit Court
22JU03633; A185181

Manuel Perez, Judge.

Argued and submitted March 18, 2025.

Gabe Newland, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Shannon Storey, Chief Defender, Juvenile Appellate Section, Oregon Public Defense Commission.

Erica L. Herb, Assistant Attorney General, argued the cause for respondent. Also on the brief were Dan Rayfield, Attorney General, and Benjamin Gutman, Solicitor General.

Before Ortega, Presiding Judge, Lagesen, Chief Judge, and Hellman, Judge.

HELLMAN, J.

Affirmed.

**HELLMAN, J.**

In this juvenile dependency case, father appeals a judgment that changed the permanency plan for father's child, M, from reunification to adoption. In a combined argument, father challenges the juvenile court's conclusions that the Department of Human Services (DHS) made reasonable efforts to reunify the family and that father had made insufficient progress toward reunification and its determination to change M's plan to adoption. We conclude that the juvenile court did not err when it concluded that DHS made reasonable efforts because the agency referred father to services that focused on ameliorating the jurisdictional basis and, after father rejected those services, the agency continued to consistently offer father services. We further conclude that the court did not err when it concluded that father made insufficient progress and when it changed M's permanency plan to adoption. Accordingly, we affirm.

Because father does not request *de novo* review, "we consider the evidence in the light most favorable to the juvenile court's disposition to determine whether it supports that court's legal conclusions." *Dept. of Human Services v. Y. B.*, 372 Or 133, 136, 546 P3d 255 (2024). We state the facts accordingly and supplement those facts in our discussion of father's assignments of error.

In January 2023, the court found M within its jurisdiction on the bases that father's "mental health" and his "residential instability interfere[d] with his ability to safely parent [M]." In July 2024, the juvenile court held a contested hearing in which DHS conceded that father had ameliorated his "residential instability." However, DHS asked the court to change M's permanency plan to adoption because father's "mental illness *** requires ongoing treatment" and because father "refuses to change his conduct or conditions to make it safer for [M] to return home." Father opposed the plan change and argued that, "given a little extra time, [he] would be able to ameliorate that last basis of jurisdiction." The juvenile court heard testimony from several witnesses, including the psychologist who conducted father's psychological evaluation and father's caseworker. After "adopt[ing] basically *** the things that [the

psychologist] said that father needed work on," "medication," "education," and "treatment, therapy," the court concluded that DHS had made reasonable efforts to reunify the family and that father had not made sufficient progress.

> "[THE COURT]: The agency made reasonable efforts to provide a resource for him by way of the group that they referred him to. He did the assessment there. And then promptly quit going to that group.
>
> "He went to the first session and I think the record indicates that he ended it in 25 minutes into the session with Sequoia Mental Health Services. *** And Exhibits Number 9 and 10 accurately reflect the efforts that Sequoia made to provide services to [father]. And he just did not want to take advantage of those."

The court then entered a permanency judgment changing M's permanency plan from reunification to adoption. This appeal followed.

ORS 419B.476 provides, in relevant part, that when "the case plan at the time of the hearing is to reunify the family," a juvenile court must "determine whether the Department of Human Services has made reasonable efforts *** and whether the parent has made sufficient progress to make it possible for the ward to safely return home." A juvenile court's determinations that DHS has made reasonable efforts and that a parent has made insufficient progress toward reunification are legal conclusions that we review for errors of law. *Dept. of Human Services v. C. H.*, 373 Or 26, 48-49, 559 P3d 395 (2024).

We begin with father's argument that the trial court erred when it concluded that DHS made reasonable efforts to reunify the family. "[I]n assessing the reasonableness of DHS's efforts to make possible the safe return of a child to the parent's care, the court must consider the totality of the circumstances related to that issue." *Id.* at 51; *see also Dept. of Human Services v. K. R. K.*, 336 Or App 843, 849, 561 P3d 1153 (2024) ("Assessing whether DHS's efforts qualified as reasonable requires that we consider the totality of circumstances over the course of the agency's involvement with the family.").

We understand father to argue that, because the psychological evaluation recommended "referr[al] to a psychiatrist" and "Psychotropic medication," "something less than trying to see a psychiatrist and getting psychotropic medication *** falls short." We reject that argument. We observe that the 21-page evaluation, which was conducted in July 2023, listed the following diagnoses:

"Bipolar I, with Mixed fears and Mood congruent psychotic features

"Differential and Rule out diagnoses include Schizo-affective Disorder; Schizophrenia; Delusional disorder

"Unspecified Anxiety Disorder

"Attention Deficit Hyperactivity Disorder - Combined type

"Features of Excoriation (skin picking) Disorder

"Features of Post Traumatic Stress Disorder."

Although the evaluation did recommend the services that father points to on appeal, it also included other findings and recommendations tailored to ameliorate the jurisdictional basis: father's mental health. Specifically, the evaluation

"recommended [father] be referred to a psychiatrist to treat his chronic mental health conditions. Psychotropic medication is indicated at this time. I would recommend treatment for bipolar I disorder with psychotic features. [Father] also needs psycho-education as part of his treatment to understand what bipolar I is, and to understand and gain insight into how he presents. Medication may help his symptoms, but medication may not impact delusions."

The evaluation further provided that father "is very likely going to resist the notion that he has mental health issues, and that he needs ongoing, sustained, and indefinite mental health treatment."

In September 2023, father participated in an intake assessment with Sequoia Mental Health Services and, based on father's statements, the staff determined that father "meets diagnostic criteria for Posttraumatic Stress Disorder as evidenced by directly experiencing traumatic events and symptoms of recurrent and distressing memories, avoidance

or efforts to avoid external reminders of people, situations and locations associated with traumatic events, anxiety, increased startle response and hypervigilance." The records from that intake assessment do not mention father's bipolar disorder diagnosis. Sequoia staff then recommended that father receive outpatient services "through Sequoia Mental Health" and stated that father "may benefit from evidenced-based treatments designed to provide support and coping skills and techniques to manage and reduce symptoms of trauma and anxiety as well as access to resources." However, the record indicates that, the following month, father left "approx[imately] 25 [minutes] into [a] session" and that he "stat[ed] decidedly 'I don't want to be here doing therapy.'" Although Sequoia attempted to "reengage" father with services in January 2024, father missed three consecutive appointments and the staff "inactivated" his account in March 2024 because he "indicated he was neither interested in therapy, nor allowing us to bill his insurance."

We now consider father's argument that DHS's efforts were unreasonable because the agency "failed to gather basic information about father's ongoing mental health treatment, which further undermined its ability to assist him."[1] "[I]n determining whether DHS made reasonable efforts, we consider a parent's lack of cooperation, but we evaluate such lack of cooperation within the context of DHS's conduct and the case circumstances." *Dept. of Human Services v. R. W.*, 277 Or App 37, 44, 370 P3d 543 (2016); *see also Dept. of Human Services v. D. M. R.*, 301 Or App 436, 444-45, 455 P3d 599 (2019) ("[A] parent's prior choice not to use DHS services does not excuse DHS from continuing to offer them.").

Here, the record demonstrates that even though father rejected treatment at Sequoia, DHS continuously attempted to communicate "cooperative[ly]" with father about mental health services. At the hearing, father's caseworker testified:

---

[1] In rebuttal, father argued: "To the extent that father is exhibiting manic behavior, he's difficult to work with, just as the department can't refuse to help a person in a wheelchair because they can't walk, the department can't refuse to help a parent with a diagnosed mental illness."

"I've received calls from [father] multiple times a week, sometimes every day. And I always answer the first call from him if I'm able. And then if I'm not able, I answer the next call or call him back. I always want to give him the opportunity to have a cooperative conversation about planning and answer his questions and do my best to work with him.

"* * * * *

"I'll offer. I've offered services and he said he doesn't want them. So we've offered them, you know, mental health. I'm the one that connected him with Dr. Sax and [the psychologist]. I've reached out to support [his] mental health, work with them. He's the one that contacted them but I've worked collaboratively with them."

Further, the caseworker testified that his "conversations with [father] don't allow me to do any planning. [Father] won't let me talk."

To the extent that father argues that DHS's efforts were unreasonable because the caseworker "did not know father was in therapy," we also reject that argument. The record is replete with evidence that father emphatically and repeatedly rejected both Sequoia's services and the caseworker's consistent offers for mental health services. Father also denied having any mental health conditions other than trauma from his experiences while in substitute care. In that context, father's caseworker was not required to inquire as to whether father had independently obtained mental health treatment in order for DHS's efforts to qualify as reasonable. As a consequence, this is not a case where DHS did not make "any subsequent attempts to provide, or even to offer, father services." *R. W.*, 277 Or App at 44.

In addition, we are unpersuaded by father's reliance on *D. M. R.*, 301 Or App at 444-46. In *D. M. R.*, we observed that "nearly every effort made by DHS, although related to helping father in a general sense, were typically provided in every case and were *unrelated* to father's chaotic relationship with mother." *Id.* at 445 (emphasis added). For example, because father "was a domestic-violence victim," "DHS provided [Womenspace] pamphlets to father." *Id.* However, DHS "provided little or no evidence concerning

precisely what programming Womenspace offered, or how that programming served to ameliorate father's 'chaotic relationship' or prevented that chaotic relationship from endangering the child." *Id.* Unlike in *D. M. R.*, the record here demonstrates that DHS's "efforts were related to ameliorating the jurisdictional basis" because referring father to Sequoia Mental Health Services focused on father's mental health. *Id.* at 444-45 ("Reasonable efforts to reunify a child with [a] parent focus on ameliorating the adjudicated bases for jurisdiction."). Accordingly, we conclude this case is distinguishable from *D. M. R.* and that the juvenile court did not err when it concluded that DHS made reasonable efforts.

We now turn to the juvenile court's conclusion that father made insufficient progress and its determination to change M's permanency plan away from reunification. Father summarily argues that "[b]ecause the department failed to prove that its reunification efforts qualified as reasonable, it necessarily failed to prove that, notwithstanding those efforts, father failed to make sufficient progress" and that the "court therefore erred in changing [M's] permanency plan from reunification to adoption." As explained above, the juvenile court did not err when it concluded that DHS made reasonable efforts. We further conclude that the juvenile court did not err when it concluded that father had made insufficient progress and when it changed M's permanency plan away from reunification.

Affirmed.